# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Richard Bernard Moore, Petitioner,

v.

Bryan P. Stirling, Commissioner, South Carolina Department of Corrections, Respondent.

Appellate Case No. 2020-001519

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

Opinion No. 28088
Heard May 5, 2021 – Filed April 6, 2022

---

## RELIEF DENIED

---

Lindsey Sterling Vann and Hannah L. Freeman, both of Justice 360, of Columbia; Gerald Malloy, of Malloy Law Firm, of Hartsville; John H. Blume, III, of Cornell Law School, of Ithaca, NY; and Whitney Boykin Harrison, of McGowan Hood & Felder, LLC, of Columbia; all for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General W. Edgar Salter III, all of Columbia, for Respondent.

William Norman Nettles, of Law Office of Bill Nettles, of Columbia, for Amicus Curiae NAACP Legal Defense and Educational Fund, Inc.

---

**CHIEF JUSTICE BEATTY:** Richard Bernard Moore ("Moore") filed a petition for a writ of habeas corpus challenging the proportionality of the death sentence that was imposed for his murder conviction. The Court ordered briefing and granted Moore's motion to argue against the precedent of *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982). In *Copeland*, the Court discussed the requirement in S.C. Code Ann. § 16-3-25(C)(3) (2015) that this Court undertake a comparative proportionality review of "similar cases" in death penalty matters. After review of the record and applicable law and consideration of the parties' arguments, we clarify *Copeland* and note the Court is not statutorily required to restrict its proportionality review of "similar cases" to a comparison of only cases in which a sentence of death was imposed. We conclude, however, that Moore has not established that he is entitled to habeas relief.

## I. FACTS

This case arises out of the armed robbery and shooting death of a convenience store clerk, James Mahoney, at Nikki's Speedy Mart in Spartanburg County in the early morning hours of September 16, 1999.

At Moore's trial in 2001, a witness who was a frequent customer at Nikki's Speedy Mart testified that he saw Moore enter the store and walk over to a cooler shortly after 3:00 a.m. The witness was seated at a gaming machine, playing video poker. A few moments later, he heard Mahoney exclaim, "What the hell do you think you are doing?" The witness swiveled his seat around and noticed Moore had a gun and was holding both of Mahoney's hands with one hand. Moore told the witness not to move and immediately shot at him. The witness was not struck, but he dropped to the floor and played dead.

The witness then heard more gunshots before Moore fled the scene in a loud pickup truck, taking a moneybag from behind the counter. The witness discovered Moore had shot Mahoney in the chest, killing him. Mahoney had also suffered a wound to his arm, which could have been caused by the same gunshot. A meat cleaver of unknown origin was lying near the body.

Moore was shot in his left arm during the incident. There was no evidence that Moore entered the store with a gun. Rather, the forensic evidence established Moore killed Mahoney with a gun that belonged to the store's owner. Witnesses testified that Mahoney usually carried a gun on his person for protection when he worked late at night, and the store's owner kept several guns on the premises, under the counter.

The State asserted Moore's motive was to obtain money to purchase crack cocaine. George Gibson testified Moore had tried to obtain crack cocaine from him earlier in the evening, but he turned Moore down because he had no money. After the shooting death of Mahoney, Moore went back to Gibson, informing him that he had money but had done something bad and needed to turn himself in. Moore sought drugs and assistance to get to the emergency room, as he was bleeding profusely from his left arm, but Gibson declined Moore's requests. As Moore was backing out of Gibson's yard to leave, he accidentally struck a telephone pole, which caught the attention of a passing officer.

When the officer approached, Moore got out of his truck and laid down in the road, stating, "I did it, I did it, I give up, I give up." On the front seat of Moore's truck, the officer saw a blue moneybag belonging to Nikki's Speedy Mart that had blood on it, as well as a pile of loose money that was covered in blood. The total recovered was $1,408.00. A pocketknife was lying on the seat, under the money.

Moore did not testify at trial. The jury convicted Moore of murder, armed robbery, possession of a firearm during the commission of a violent crime, and assault with intent to kill. In the sentencing phase, the jury recommended the death penalty after finding three of the aggravating circumstances set forth in S.C. Code Ann. § 16-3-20(C)(a) (2015): Moore committed the murder during the commission of a robbery while armed with a deadly weapon, he knowingly created a great risk of death to more than one person in a public place by means of a weapon or device that normally would be hazardous to the lives of more than one person, and he committed the murder for the purpose of receiving money or a thing of monetary value. The trial judge sentenced Moore to death.

On direct appeal, this Court affirmed Moore's convictions and death sentence. *State v. Moore*, 357 S.C. 458, 593 S.E.2d 608 (2004). As part of the direct appeal, this Court performed the comparative proportionality review required by S.C. Code Ann. § 16-3-25(C)(3) (2015).

Moore subsequently filed an application for post-conviction relief ("PCR"), in which he raised numerous allegations of ineffective assistance of counsel. Moore testified at his PCR hearing in 2011 and contradicted the evidence presented at trial. He alleged Mahoney was the aggressor, that he took a gun away from Mahoney after a struggle and fired "blindly" at him after seeking cover, and that he took the bag of money only as an after-thought as he left the store.[1] Moore further maintained that he went to Gibson's home immediately after the shooting to get help for the injury to his arm, not to obtain drugs. The PCR judge found Moore's claims of ineffective assistance of counsel to be without merit and filed an order of dismissal on August 1, 2011. This Court denied Moore's petition for a writ of certiorari. The Supreme Court of the United States also denied Moore's petition for review. *Moore v. South Carolina*, 576 U.S. 1058 (2015).

Moore filed a federal habeas corpus petition in 2015. The United States District Court for the District of South Carolina adopted the Magistrate's Report and Recommendation and denied the petition. *Moore v. Stirling*, No. 4:14-04691-MGL, 2018 WL 1430959 (D.S.C. Mar. 21, 2018). The United States Court of Appeals for the Fourth Circuit affirmed. *Moore v. Stirling*, 952 F.3d 174 (4th Cir. 2020). The United States Supreme Court denied Moore's request for a writ of certiorari. *Moore v. Stirling*, 141 S. Ct. 680 (2020).

Moore has now filed a habeas petition with this Court that alleges his death sentence is disproportionate and challenges the Court's proportionality review conducted at the time of his direct appeal. We ordered briefing and oral argument on the following two questions:

> (1) Was Petitioner's death sentence disproportionate to the penalty imposed in similar cases?

---

[1] Moore testified that he usually went to Nikki's Speedy Mart two or three times a week, but had recently lost his job. Moore stated he was sure Mahoney recognized him from their prior interactions. For example, Mahoney had helped him purchase a lighter and filled it for him. Moore claimed that, on the night of Mahoney's death, he was short of change and had asked Mahoney if he could use money from a "change cup" on the counter, but Mahoney said "no" and the two had words. Moore maintained Mahoney pulled out a gun when he refused to leave the store, and Mahoney was shot when they struggled over the gun.

(2) In determining the proportionality of the death sentence, should similar cases in which the death penalty was not imposed be considered?

## II. DISCUSSION

This Court is statutorily required to undertake a comparative proportionality review to determine if "the sentence of death is excessive or disproportionate to the penalty imposed in *similar cases*, considering both the crime and the defendant." S.C. Code Ann. § 16-3-25(C)(3) (2015) (emphasis added). Moore's contentions to this Court focus on the meaning of "similar cases" as used in the statute. To provide the full context, we note subsection 16-3-25(C) states in its entirety as follows:

> (C) With regard to the sentence, the court shall determine:
>
> > (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
> >
> > (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 16-3-20, and
> >
> > (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Id.* § 16-3-25(C).

This Court performed a review of Moore's death sentence pursuant to subsection 16-3-25(C) at the time of his direct appeal in 2004, at which time we found Moore's death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of aggravating circumstances was supported by the evidence. *Moore*, 357 S.C. at 465, 593 S.E.2d at 612. We further found the death penalty was not excessive or disproportionate to the penalty imposed in similar capital cases, referencing four cases relied upon for our comparison. *Id.* at 465–66, 593 S.E.2d at 612 (citing *State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57, *cert. denied*, 520 U.S. 1277 (1997); *State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996), *cert. denied*, 520 U.S. 1123 (1997); *State v. Sims*, 304 S.C. 409, 405 S.E.2d

377 (1991), *cert. denied,* 502 U.S. 1103 (1992); and *State v. Patterson,* 285 S.C. 5, 327 S.E.2d 650 (1984), *cert. denied,* 471 U.S. 1036 (1985)).

Moore contends his death sentence is disproportionate under any meaning of the term "similar cases" and should, therefore, be vacated by this Court. We previously interpreted "similar cases" in *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982). In *Copeland*, we observed that comparative proportionality review, where it exists, has been left to state determination because the United States Supreme Court has declined to impose any specific model of review upon the states. *Id.* at 590, 300 S.E.2d at 74. As a result, we found subsection 16-3-25(C) "represents an act of legislative grace by the [South Carolina] General Assembly which we are required to interpret in accordance with sound rules of statutory construction." *Id.* at 590–91, 300 S.E.2d at 74. We noted that, "[u]nder the statute, the task of defining 'similar cases' and with it the scope of any comparative analysis is plainly and properly left to this Court." *Id.* at 587, 300 S.E.2d at 72.

We determined in *Copeland* that the Court should begin its comparison by looking to other cases involving an actual conviction and sentence of death. *Id.* at 591, 300 S.E.2d at 74 ("In our view, the search for 'similar cases' can only begin with an actual conviction and sentence of death rendered by a trier of fact in accordance with § 16-3-20 of the Code. We consider such findings by the trial court to be a threshold requirement for comparative study and indeed the only foundation of 'similarity' consonant with our role as an appellate court.").

Moore notes, however, that the current proportionality procedure was previously called into question by this Court in *State v. Dickerson*, 395 S.C. 101, 716 S.E.2d 895 (2011). In *Dickerson*, the defendant asserted to the circuit court that South Carolina's proportionality review was deficient because it failed to examine cases where a sentence of death was not imposed. *Id.* at 125 n.8, 716 S.E.2d at 908 n.8. The defendant relied upon Justice Stevens's statement in *Walker v. Georgia*, 555 U.S. 979 (2008) (Stevens, J., statement respecting denial of certiorari), in which Justice Stevens wrote that examining similar cases "assume[s] that the court would consider whether there were 'similarly situated defendants' who had *not* been put to the death because that inquiry is an essential part of any meaningful proportionality review." *Id.* (alteration in original) (quoting *Walker*, 555 U.S. at 980). This Court observed Justice Stevens had noted that this broader comparison "is 'judicious because, quite obviously, a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the

sentence before the court.'" *Id.* (quoting *Walker*, 555 U.S. at 981). We recited the following reasoning from Justice Stevens:

> Had the Georgia Supreme Court looked outside the universe of cases in which the jury imposed a death sentence, it would have found numerous cases involving offenses very similar to petitioner's in which the jury imposed a sentence of life imprisonment. If the Georgia Supreme Court had expanded its inquiry still further, it would have discovered many similar cases in which the State did not even seek death. Cases in both of these categories are eminently relevant to the question of whether a death sentence in a given case is proportionate to the offense. The Georgia Supreme Court's failure to acknowledge these or any other cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations.

*Id.* (citations omitted in original) (quoting *Walker*, 555 U.S. at 982–83).

We ultimately concluded in *Dickerson* that any issue regarding the pool of suitable cases for proportionality review was not then before us, but "we note[d] our concern that restricting our statutorily-mandated proportionality review to only similar cases where death was actually imposed is largely a self-fulfilling prophecy as simply examining similar cases where the defendant was sentenced to death will almost always lead to the conclusion that the death sentence under review is proportional." *Id.*

Moore now contends to this Court that his sentence is disproportionate based on current precedent regarding comparative proportionality review and based on an extension of that precedent. Moore first argues that, under the existing precedent of *Copeland*, in which a death sentence is compared to other cases resulting in a death sentence, the proportionality review conducted at the time of his direct appeal in 2004 was insufficient due to the nature of the cases selected for comparison. In the alternative, Moore contends this Court should expand its comparative proportionality review to include a larger pool of cases, as a comparison to only other cases in which the death penalty was imposed leads to an inherent bias towards the imposition of the death penalty, as noted by Justice Stevens, *see Walker*, 555

U.S. at 982–83, and by this Court, *see Dickerson*, 395 S.C. at 125 n.8, 716 S.E.2d at 908 n.8.  Moore asserts his death sentence is still disproportionate when compared to any larger pool of cases, and he has submitted comparison cases for the Court's consideration.

In response, the Commissioner of the South Carolina Department of Corrections ("Commissioner") argues habeas corpus proceedings are limited to constitutional issues and Moore's arguments concerning statutory comparative proportionality review do not involve a constitutional claim, so his allegation is not cognizable in a habeas proceeding.  The Commissioner further asserts Moore received a sufficient proportionality review at the time of his direct appeal and his sentence is not disproportionate.  Lastly, the Commissioner contends *Copeland* and existing precedent properly restrict the pool of comparison cases to those in which a sentence of death has been imposed.

We begin by examining the availability of habeas corpus relief in this state. "Notwithstanding the exhaustion of appellate review, including all direct appeals and PCR, habeas corpus relief remains available to prisoners in South Carolina." *Williams v. Ozmint*, 380 S.C. 473, 477, 671 S.E.2d 600, 602 (2008) (citing S.C. Const. art. I, § 18); *see also Simpson v. State*, 329 S.C. 43, 46 n.4, 495 S.E.2d 429, 431 n.4 (1998) (stating under our state constitution, this Court retains the ability to entertain petitions seeking habeas relief in our original jurisdiction (citing S.C. Const. art. V, § 5)).

We have repeatedly observed that a writ of habeas corpus is reserved for the very gravest of constitutional violations, "which, *in the setting*, constitute[] a denial of fundamental fairness shocking to the universal sense of justice."  *Butler v. State*, 302 S.C. 466, 468, 397 S.E.2d 87, 88 (1990) (citation omitted); *accord Ozmint*, 380 S.C. at 477, 671 S.E.2d at 602; *McWee v. State*, 357 S.C. 403, 406, 593 S.E.2d 456, 457 (2004); *Green v. Maynard,* 349 S.C. 535, 538, 564 S.E.2d 83, 84 (2002).  The phrase "'in the setting' refers specifically to the totality of the facts and circumstances in the defendant's case."  *Ozmint*, 380 S.C. at 479 n.4, 671 S.E.2d at 603 n.4.

We have cautioned that not every constitutional error will justify issuance of the writ.  *Butler*, 302 S.C. at 468, 397 S.E.2d at 88.  Rather, two components are needed to meet the standard articulated in *Butler* and other cases.  The petitioner must prove (1) the existence of a constitutional violation; and (2) the denial of fundamental fairness which, in the setting, is shocking to the universal sense of justice.  *See Tucker v. Catoe*, 346 S.C. 483, 494–95, 552 S.E.2d 712, 718 (2001)

(stating the finding of a constitutional violation "does not end our *Butler* inquiry, for relief is appropriate only where the violation 'in the setting, constitutes a denial of fundamental fairness shocking to the universal sense of justice'" (quoting *Butler*, 302 S.C. at 468, 397 S.E.2d at 88)).

A habeas petition must support the relief requested. *Gibson v. State*, 329 S.C. 37, 40, 495 S.E.2d 426, 427 (1998). While the allegations in the petition are treated as true, the petition must set forth a prima facie case showing the petitioner is entitled to relief. *Id.* In other words, it must allege that the petitioner has exhausted all other remedies, and it must set out a constitutional claim that meets the standard delineated in *Butler*. *Id.* at 40, 495 S.E.2d at 428. "Habeas relief is seldom used and acts as an ultimate ensurer of fundamental constitutional rights." *Ozmint*, 380 S.C. at 477, 671 S.E.2d at 602. For these reasons, a defendant bears a much higher burden of proof in a habeas proceeding. *Id.*

The issues Moore asserts concern the alleged insufficiency of the comparative proportionality review conducted by this Court as part of his direct appeal. The United States Supreme Court has held there is a difference between traditional proportionality analysis and comparative proportionality review that is afforded by statute. *Pulley v. Harris*, 465 U.S. 37, 43 (1984). In *Pulley*, the Supreme Court explained, "Traditionally, 'proportionality' has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime." *Id.* at 42–43. It further noted, "Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." *Id.* at 43.[2]

---

[2] For example, the Supreme Court has determined that the Eighth Amendment's prohibition on cruel and unusual punishment prevents the execution of minors and persons with intellectual disabilities, persons whose role in a crime was minor, or those who committed a non-homicide offense. *See Roper v. Simmons*, 543 U.S. 551 (2005) (minors); *Atkins v. Virginia*, 536 U.S. 304 (2002) (persons with intellectual disabilities); *Enmund v. Florida*, 458 U.S. 782 (1982) (co-defendant had a minor role and did not kill, attempt to kill, or contemplate that life would be taken); *Coker v. Georgia*, 433 U.S. 584 (1977) (non-homicide). The Supreme Court has stated it applies "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and

In contrast, comparative proportionality review, which many states provide by statute, "presumes that the death sentence is not disproportionate to the crime in the traditional sense." *Id.* "It purports to inquire instead whether the penalty is nonetheless unacceptable *in a particular case* because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Id.* (emphasis added); *see also* Bruce Gilbert, Comment, *Comparative Proportionality Review: Will the Ends, Will the Means*, 18 Seattle U. L. Rev. 593, 623 n.189 (1995) (stating "comparative proportionality review is a separate issue from anything that the jury has been asked to decide, and should be treated as such by [an appellate court]").

In *Pulley*, the Supreme Court described comparative proportionality review as "an additional safeguard against arbitrary or capricious sentencing" that arose in many states in response to *Furman v. Georgia*, 408 U.S. 238 (1972). *Pulley*, 465 U.S. at 44–45. "In *Furman,* the Court concluded that capital punishment, as then administered under statutes vesting unguided sentencing discretion in juries and trial judges, had become unconstitutionally cruel and unusual punishment." *Id.* at 44.

The Supreme Court observed in *Pulley* that comparative proportionality review is not a fixed constitutional requirement under the Eighth Amendment in every capital case. *Id.* at 50–51 ("There is . . . no basis in our [Supreme Court] cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it. . . . We are not persuaded that the Eighth Amendment requires us to take that course.").

Since the Supreme Court has not defined its contours, states have varied in their application of comparative proportionality review. *See Copeland*, 278 S.C. at 590, 300 S.E.2d at 74; *see also* Lawrence S. Lustberg & Lenora M. Lapidus, *The Importance of Saving the Universe: Keeping Proportionality Review Meaningful*, 26 Seton Hall L. Rev. 1423, 1461 (1996) (observing "the exact role of proportionality review varies from state to state in relation to the variations in the overall capital sentencing scheme of the particular state"). Some states have even eliminated comparative proportionality review after *Pulley. See, e.g.*, *Lawrence v. Florida*, 308 So. 3d 544, 548–52 (Fla. 2020) (eliminating comparative proportionality review from the state's scope of appellate review, noting it was not required by any state statute, that the court was bound under the state constitution's conformity clause to interpret the prohibition on cruel and unusual punishment in conformity with the

---

unusual in violation of the Eighth Amendment. *Roper*, 543 U.S. at 561 (citation omitted).

Supreme Court's decisions on the subject, and "[t]he Supreme Court has held that comparative proportionality review of death sentences is not required by the Eighth Amendment" (citing *Pulley*, 465 U.S. at 50–51)).

However, the Supreme Court later clarified that *Pulley* does not stand for the broad proposition that comparative proportionality review is never an essential component of a constitutional death penalty scheme. *See Walker*, 555 U.S. at 983–84 (commenting that, after the assertion in *Pulley* that the Eighth Amendment does not require comparative proportionality review of every capital sentence, some states, including Georgia, initially narrowed their scope of review, "[b]ut that assertion was intended to convey our recognition of differences among the States' capital schemes and the fact that we consider statutes as we find them []; it was not meant to undermine our conclusion in *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)] and *Zant* [*v. Stephens*, 462 U.S. 862 (1983)] that such review is an important component of the Georgia scheme").

In *Gregg v. Georgia*, referenced above, the Supreme Court concluded Georgia's revised death penalty scheme (post-*Furman*) met constitutional standards. The Supreme Court relied on several factors in giving its approval to the revision, including the "important component" (per *Walker*, 555 U.S. at 984) of Georgia's implementation of comparative proportionality review. As one legal commentator has noted, all of the factors cited by the Supreme Court were essential to its determination:

> First, the Court [in *Gregg*] believed that the bifurcated proceedings and enumerated aggravating circumstances helped guide the jury, and hence, reduced the arbitrary imposition of the death penalty. Second, comparative proportionality review was deemed to provide a safeguard against an "aberrant" jury. And finally, the statute provided flexible and individualized procedures for determining whether the death penalty was being imposed in an arbitrary and capricious manner.

Gilbert, *supra*, at 599 (footnotes omitted).

Thus, when examined in detail, *Pulley* merely answered the question whether comparative proportionality review was *always* a prerequisite to a constitutional capital sentencing scheme under the Eighth Amendment. *Id.* While *Pulley*

concluded that no *one* review procedure was universally required because state sentencing statutes and procedures varied throughout the country, the Supreme Court nevertheless confirmed that all states must have "a means to promote the evenhanded, rational, and consistent imposition of death sentences." *Id.* at 600 (quoting *Pulley*, 465 U.S. at 49). Thus, some form of meaningful appellate review is likely still required to avoid the arbitrariness and inconsistencies deemed unconstitutional in *Furman*. *Id.* Because the Supreme Court described the implementation of comparative proportionality review as an "important component" of its approval of Georgia's revised death penalty scheme, it is clear that this procedure was essential to the statute passing constitutional muster in the absence of another, comparable safeguard.

Moreover, while we have previously stated South Carolina's comparative proportionality review under subsection 16-3-25(C)(3) "represents an act of legislative grace by the General Assembly," *Copeland*, 278 S.C. at 590, 300 S.E.2d at 74, this does not end our analysis in this regard. We, like the Supreme Court, "consider statutes as we find them." *Walker*, 555 U.S. at 983. Our General Assembly has specifically required comparative proportionality review as an essential component of South Carolina's capital sentencing scheme to avoid the arbitrariness discussed in *Furman*, *Gregg*, *Pulley*, and other cases. In fact, this Court is statutorily required to provide a comparative proportionality review for a capital case even in the absence of a direct appeal by the defendant. *See* S.C. Code Ann. § 16-3-25(F) (2015) ("The sentence review *shall be in addition to direct appeal, if taken*, and the review and appeal shall be consolidated for consideration." (emphasis added)); *State v. Motts*, 391 S.C. 635, 649, 707 S.E.2d 804, 811 (2011) (recognizing a defendant can waive a direct appeal but "cannot waive this Court's statutorily-imposed duty to review his capital sentence").

Having been statutorily directed to undertake comparative proportionality review for all persons receiving a capital sentence, we hold an allegation concerning the failure to adequately provide this mandated review for an individual defendant to prevent the wrongful deprivation of life implicates that defendant's right to due process and, therefore, presents a constitutional issue. *See* S.C. Const. art. I, § 3 (stating no "person [shall] be deprived of life, liberty, or property without due process of law, nor shall any person be denied the equal protection of the laws"); *see also S.C. Ambulatory Surgery Ctr. Ass'n v. S.C. Workers' Comp. Comm'n*, 389 S.C. 380, 392, 699 S.E.2d 146, 153 (2010) (observing an interest protected by due process arises when there is a legitimate claim of entitlement that is created and defined by

independent sources and not just by a "unilateral expectation" (citation omitted)). The discussion in *Pulley* as to the Eighth Amendment is not controlling of a defendant's right to due process under our state constitution. As a result, we hold Moore's petition alleging an inadequate comparative proportionality review of his sentence presents a cognizable constitutional claim in the context of this state habeas proceeding. *See, e.g.*, *Butler*, 302 S.C. at 468, 397 S.E.2d at 88 (setting forth the habeas framework, the first requirement of which is a constitutional claim).

Because Moore presents a cognizable claim, we turn now to the merits of his contention that this Court's comparative proportionality review was inadequate. Moore asserts the review was insufficient because, since the time of his direct appeal, the death sentences in three of the four cases cited for comparison in the Court's opinion were overturned. We find this point unavailing as none of the cases were overturned for a reason that influenced any part of the Court's analysis under subsection 16-3-25(C), including the proportionality review. The State's failure to disclose exculpatory evidence during the sentencing phase in *Simpson*, the fact that the defendant in *George* was categorically exempt from capital punishment due to his mental status, and the failure to allow the defendant in *Patterson* to show adaptability to prison are reasons or flaws in the trial procedure that do not alter the underlying facts of the offenses committed and the existence of any aggravating factors, nor do they alter our determination that Moore's capital sentence was not the result of passion, prejudice, or any other arbitrary factors.

In addition, Moore opines that the cases relied on by the Court appear to have been selected based solely on having a similar aggravating circumstance of armed robbery. He asserts the circumstances of those cases are more severe than his own and, therefore, do not support a finding of proportionality. In particular, Moore contends the Court's factual recitation in its opinion on direct appeal does not even mention the fact that he did not bring a gun into Nikki's Speedy Mart. He argues this is a significant fact that fundamentally distinguishes his situation from the comparison cases, which he states involved planned robberies.

We disagree with Moore's characterization, as his own offenses were similarly egregious and appropriate for comparison with the selected cases. Whether Moore entered the store with a weapon or whether he armed himself once inside is not determinative of either his intent or the egregiousness of the offenses he ultimately committed. The significant fact is that Moore became armed at some point during the commission of the offenses. *See generally State v. Keith*, 283 S.C. 597, 598–99, 325 S.E.2d 325, 326 (1985) (holding a defendant is guilty of armed robbery if he

becomes armed with a deadly weapon at any point while the robbery is being perpetrated and need not be armed at all times during the offense).

After hearing the evidence at trial, a jury found Moore intentionally shot and killed the store employee during an armed robbery and he endangered the life of a bystander for the obvious purpose of eliminating the only eyewitness to the murder. The robbery in this case could have resulted in two deaths but for the astute actions of the eyewitness, who "played dead" when Moore shot at him. The jury considered all of the attendant facts in determining there were statutory aggravating circumstances that qualified this as a capital case. Looking at the aggravating circumstances present in other cases is an obvious point for comparison when analyzing whether a defendant's capital sentence is the result of a jury's arbitrariness or is disproportionate to the sentences of other offenders.

Moore alternatively argues this Court should expand the relevant pool of cases to be reviewed beyond those in which a death sentence was imposed, as is currently done in accordance with the precedent of *Copeland*. Moore contends this expansion is necessary to adequately fulfill the statutory requirement of reviewing "similar cases," and he asserts his death sentence is disproportionate based on an expanded comparison of cases. We granted Moore's motion to argue against precedent, and we agree that our comparative proportionality review statute should not be so narrowly construed.

Determining the universe of cases to be considered is primarily a matter of statutory interpretation, as indicated in *Copeland*. The General Assembly's statutory directive requires the Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." S.C. Code Ann. § 16-3-25(C)(3). Because the plain language of the statute directs the Court to compare the death sentence under review "to the *penalty imposed* in similar cases," this clearly requires that the comparison cases be matters that have resulted in a conviction and "penalty," i.e., a sentence. *See id.* (emphasis added). This conclusion is also apparent from the Supreme Court's observation in *Pulley* that comparative proportionality review typically is intended to compare the particular sentence of one defendant "to the *punishment imposed* on others *convicted* of the same crime." *Pulley*, 465 U.S. at 43 (emphasis added). Consequently, we decline to adopt Moore's proposal to expand the pool of cases to incidents or charges that have not resulted in a conviction and sentence.

We agree with Moore, however, that the language of South Carolina's proportionality statute does not expressly limit the pool of cases to only those in which the death penalty was actually imposed. For convictions of murder, therefore, a review can ostensibly encompass a comparison of death-eligible cases for which a record is available for our review. This can include, for example, cases where a defendant's conduct was eligible for a capital sentence, but the State elected to seek only a life or lesser sentence, as well as cases where a jury considered but ultimately declined to impose a death sentence. The comparison cases must have a record because the General Assembly indicates in subsection 16-3-25(E) that this Court must include references in its opinion to the cases considered and transmit the records of those cases to the circuit court in the event resentencing is ordered. *See* S.C. Code Ann. § 16-3-25(E) (2015) ("The court shall include in its decision a reference to those similar cases which it took into consideration."); *id.* § 16-3-25(E)(2) ("The records of those similar cases referred to by the Supreme Court of South Carolina in its decision, and the extracts prepared as hereinafter provided for, shall be provided to the resentencing judge for his consideration."). Accordingly, we clarify *Copeland* and hold subsection 16-3-25(C)(3) does not limit the pool of comparison cases to only those in which the defendant actually received a sentence of death.

Life sentences traditionally were not included in the pool of comparison cases in most states because, as a general rule, life sentences are not appealed, so there is no appellate record. *See generally* Cynthia M. Bruce, *Proportionality Review: Still Inadequate, But Still Necessary*, 14 Cap. Def. J. 265, 267 (2002) (noting life sentences are rarely the subject of an appeal disputing the sentence imposed).[3] However, cases resulting in life sentences are more often being included in the pool of comparison cases in states that conduct comparative proportionality reviews. *See* Lustberg & Lapidus, *supra*, at 1462 (stating "the vast majority of states that conduct proportionality review use a broader universe" of comparison cases than just those in which the death penalty was imposed). Because only the records of cases in which

---

[3] The category of cases resulting in a life sentence can encompass a number of potential cases in some jurisdictions. *See* Bruce, *supra*, at 269 (enumerating "(1) bench trials resulting in life sentences; (2) guilty pleas resulting in a life sentence not pursuant to a plea bargain on charge or sentence; (3) cases in which the judge sentences to life over the jury's death verdict; (4) jury trials in which a life sentence was imposed and not appealed; and (5) jury trials in which a life sentence was imposed and later appealed on trial error").

there has been an appeal are readily accessible by this Court, if a defendant seeks the Court's consideration of a case that has not resulted in an appeal, the defendant shall submit to the Court an official record of the conviction and sentence, including a trial transcript, for consideration in the Court's review.

In his submissions to this Court, Moore has highlighted additional cases as part of an expanded pool of comparison cases for the Court's consideration. Due to our clarification of *Copeland*, we have considered those cases that would have been available at the time of Moore's direct appeal and comparative proportionality review in 2004. We find, however, that the additional cases he now advances do not alter our determination that his sentence is not disproportionate to the penalties given in other similar cases.

Moore argues his capital sentence is disproportionate based, in large part, on his contention that, unlike some cases he references, he did not enter the premises with a gun and therefore had no intent to commit the robbery and murder of which he stands convicted. As previously discussed, this premise is flawed because the relevant fact is whether Moore became armed at some point during the commission of the offenses, so his argument in this regard does not affect the outcome of our proportionality analysis. Moreover, a jury considered the evidence at trial and found Moore intentionally robbed and murdered the store employee and knowingly endangered the life of another person. The jury specifically found the State had proven, beyond a reasonable doubt, three of the aggravating circumstances set forth in subsection 16-3-20(C)(a): Moore committed the murder during the commission of a robbery while armed with a deadly weapon, he knowingly created a great risk of death to more than one person in a public place by means of a weapon or device that normally would be hazardous to the lives of more than one person, and he committed the murder for the purpose of receiving money or a thing of monetary value. *See* S.C. Code Ann. § 16-3-20(C)(a)(1)(e), -(a)(3), -(a)(4) (2015). Any one of these aggravating circumstances qualified Moore for a capital sentence. *See id.* § 16-3-20(C) ("Unless at least one of the statutory aggravating circumstances enumerated in this section is found, the death penalty must not be imposed.").

Moore also maintains his case is distinguishable from those in which a defendant received a death sentence for a crime involving more than one murder victim. A sizable number of the defendants receiving a capital sentence in this state have engaged in crimes that involved only one murder victim. The murder of two or more persons is just one aggravating circumstance out of a dozen that statutorily qualifies a defendant for a capital sentence, *see id.* § 16-3-20(C)(a)(9), and the fact

that Moore did not kill more than one person does not negate the presence of the three other aggravating circumstances found by the jury. Further, the jury obviously considered the fact that Moore attempted to eliminate the only eyewitness to the armed robbery and murder of the store clerk, who narrowly avoided being a second victim. Accordingly, we are not persuaded that the lack of a second murder victim renders Moore's capital sentence disproportionate.

Lastly, Moore contends his sentence is disproportionate when compared to similar armed robbery cases that did not ultimately result in a death sentence. Moore notes that in some cases, the solicitor did not seek a death sentence. In addition, Moore generally asserts there have been cases in which a life sentence was given by a jury, or which resulted in a life sentence because the defendant was allowed to plead guilty in exchange for a life sentence after an appeal or was resentenced in cases in which a death sentence was overturned. He argues his case is qualitatively less egregious and that his situation is unique compared to any other defendant because there was no evidence that he planned to commit a robbery or murder the day he went to Nikki's Speedy Mart, and he reiterates that there was no evidence that he carried a gun with him into the store.

We recognize that the severity and brutality of crimes may vary, and Moore questions why a jury did not impose a life sentence in his case. Moore argues others have done far "worse," and the death penalty should be reserved for only the most "atrocious" cases. As written, South Carolina's capital sentencing scheme designates the aggravating circumstances that qualify a defendant for a capital sentence. The selection of those circumstances is a decision that is solely within the purview of the General Assembly, which enacted South Carolina's statutory capital sentencing scheme. Whether that statutory threshold has been met is a determination for the jury, which must then decide whether to recommend a death sentence or a life sentence. Likewise, this Court has no control over the actions of a solicitor in electing to pursue the highest penalty in a case that statutorily qualifies for a capital sentence.

Whether this Court would impose a death sentence under the same circumstances is not within the permitted scope of this Court's appellate review. Rather, the Court's task in comparative proportionality review aims to ensure that a jury's decision was not the result of arbitrariness. In comparative cases where a defendant's death sentence was overturned on appeal, if the sentence was vitiated due to factors that did not relate to the underlying facts and circumstances of the case, it does not present a sufficient justification for finding Moore's sentence is

disproportionate.  *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005) (finding minors categorically may not be sentenced to death for murder).  To the extent Moore urges the Court to find his sentence disproportionate because he did not bring a weapon to the scene and had no intent to commit the offenses for which he was convicted, we hold, as we must, that this assertion does not negate the jury's findings as to his intent, and a jury has found against him in that regard.  This Court's scope of review does not allow it to disregard the factual findings in the case and pronounce an alternative sentence in these circumstances.  For all the foregoing reasons, we hold Moore has not established that his capital sentence is disproportionate.

## III.  CONCLUSION

We conclude Moore has not established grounds for awarding habeas relief. However, as a point of law, we clarify our holding in *Copeland* and hold this Court is not statutorily required to limit the pool of "similar cases" for comparative proportionality review to only those cases in which the death penalty was imposed.

**HABEAS RELIEF DENIED.**

**FEW and JAMES, JJ., concur.  KITTREDGE, J., concurring in result only.  HEARN, J., concurring in part and dissenting in part in a separate opinion.**

**JUSTICE HEARN:** This Court has never found a single death sentence disproportionate dating back to 1977, the first time comparative proportionality review was required by the General Assembly. This includes the forty-three individuals who have been executed by the State of South Carolina during this modern era of capital punishment, and all of the thirty-five inmates currently housed on death row who have exhausted their direct appeal. The State characterizes these statistics—currently, approximately zero for seventy-seven[4]—as proof that our capital sentencing scheme functions as it should. I write separately to express my view that our system is broken and to disagree with that part of the majority opinion which finds Petitioner Richard Moore's sentence proportionate to his crime.

Moore was duly convicted under the laws of our state for the murder of James Mahoney during the commission of an armed robbery, assault with intent to kill, and possession of a firearm during the commission of a violent crime. My disagreement with the majority has nothing to do with the reliability of Moore's convictions. Unquestionably, Moore is guilty.[5] But that is not the end of the inquiry; rather, it is only the beginning, as a death sentence demands the highest protections afforded by law due to its obvious severity and finality. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (noting "that the imposition of death by public authority is so profoundly different from all other penalties . . . ."); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed."). While this Court affirmed his conviction and sentence on direct appeal—and other courts have done the same throughout Moore's more than twenty years navigating through our criminal justice system— that also is not dispositive. I wholeheartedly agree with the majority that Moore presents a constitutional claim opening the door to habeas review. Yet, I find the majority's conclusion that Moore's sentence is not disproportionate when compared to similar cases utterly unpersuasive. Consequently, Richard Moore will be put to death for a sentence that I do not believe is legal under our law. Nothing could be more "shocking to the universal sense of justice," *Butler v. State*, 302 S.C. 466, 468, 397 S.E.2d 87, 88 (1990), and thus, habeas relief is warranted.

---

[4] In particular, the direct appeal for Timothy Ray Jones is currently ongoing, thus precluding his case from this number.

[5] Indeed, Moore's counsel candidly acknowledged Moore's guilt during oral argument.

I begin by reiterating that I agree with the majority's conclusion that Moore presents a cognizable claim for habeas review. As the majority thoroughly discusses, notwithstanding the statutory origins of comparative proportionality review, the result of the State executing a person whose death sentence is disproportionate undoubtedly raises serious due process concerns and would be arbitrary. While the form of our review is not constitutionally mandated, its substance reaches to the core of the constitutional enshrinement against the infliction of arbitrary capital punishment. *See State v. Graham*, 172 N.E.3d 841, 890 (Ohio 2020) (Donnelly, J., concurring) ("[T]he form [of proportionality review] is not constitutionally required, but the substance is. And in Ohio we have it backwards: we have the form but lack the substance."). Whether by virtue of the Eighth Amendment's ban on cruel and unusual punishment or the Fourteenth Amendment's protections of substantive due process, the underlying interests at stake invoke more than merely an issue of state law. There can be no debate that a death sentence that is arbitrary and capricious is unconstitutional.[6] *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) ("[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.").

I also agree that our review of the "pool of similar cases" must not be as narrowly construed as the standard enunciated in *Copeland*. Accordingly, I join the majority's decision to revisit *Copeland* and overrule it to the extent it requires only a comparison of cases resulting in death. However, I respectfully part company with the conclusion that Moore's sentence is not disproportionate to the penalty imposed in similar cases.

Turning to the framework established by the General Assembly, this Court,

---

[6] We have implicitly elevated our statutorily required review of death sentences above even certain constitutional rights, as an individual cannot waive our duty to review his death sentence under section 16-3-25(C) but can waive his direct appeal. *State v. Motts*, 391 S.C. 635, 649, 707 S.E.2d 804, 811 (2011) ("Although Motts is entitled to waive his personal right to a direct appeal, we hold that he cannot waive this Court's statutorily-imposed duty to review his capital sentence."). Adopting the State's position that this matter does not qualify for habeas relief would lead to the perplexing result that habeas is not available in a challenge to this mandatory review yet constitutional errors that otherwise may qualify for relief are waivable.

[S]hall determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
>
> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 16-3-20, and
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

S.C. Code Ann. § 16-3-25(C) (2015). Immediately apparent from the text is that our review involves more than determining whether the jury reached its decision arbitrarily or whether evidence supports the jury's conclusion as to the existence of aggravating circumstances. Admittedly, those two considerations are set forth in subsections (C)(1) and (C)(2), but the General Assembly goes further in (C)(3) by requiring the Court review each death sentence to ensure it is not excessive or disproportionate. Significantly, Moore does not argue the Court erred in its direct appeal determination pertaining to subsections (C)(1) and (2), counsel for Moore specifically disclaimed any challenge to the facts supporting the jury's verdict during oral argument, and his entire dispute concerns only this Court's legal requirement to engage in comparative proportionality review under subsection (C)(3). This is because the Court's order directing briefing and setting oral argument focused on two questions, both of which turned solely on section 16-3-25(C)(3). Accordingly, we are *not* limited to analyzing whether evidence supports the jury's decision because statutorily, our role is much broader.

Following this framework, I would find Moore's death sentence invalid because it is disproportionate. There is no dispute that when Moore entered Niki's convenience store during the early morning hours of September 16, 1999, he did so unarmed. Of course, the majority is correct that an armed robbery occurs the moment a defendant arms himself during the commission of a robbery. Thus, I have no quarrel with the majority's conclusion that the record clearly demonstrates Moore committed armed robbery, meaning there was sufficient proof of the presence of an aggravating factor to qualify him for the death penalty. *See* S.C. Code Ann. § 16-3-25(C)(2). While I do not discount that our comparative proportionality review would include reviewing cases with similar aggravating circumstances—an "obvious point

for comparison" as the majority notes—it cannot represent both the beginning and end of our inquiry because the General Assembly has specifically accounted for that in the preceding subsection. Accordingly, our analysis must be more meaningful, and cannot simply default to determining whether evidence supported the jury's verdict. Stated differently, by discounting Moore's unarmed status upon entering the store, we risk conflating our independent proportionality review with the more traditional appellate role of determining whether any evidence supports the jury's conclusion that certain aggravating circumstances exist.

Consequently, I believe the majority errs in repeatedly rejecting the significance of Moore's unarmed status upon entering the store. For example, the majority states this fact is "not determinative," that it represents a "flawed premise," and that it "does not negate the jury's findings as to his intent, and a jury has found against him in that regard." In isolation, I agree with the truth of those statements. However, I fail to see how they impact the discrete issue before the Court. By focusing on the jury's decision rather than on whether this death sentence is excessive or disproportionate compared to other similar cases, the majority substantially undermines this Court's responsibility under section 16-3-25(C)(3). Only this Court—not a jury—can determine whether a sentence is disproportionate. With all due respect for the jury's verdict here, it should not be our main focus at this latent stage of the proceedings.

Our comparative proportionality review under section 16-3-25(C)(3) does not turn on whether there is evidence of an armed robbery. That consideration is part of the preceding subsection, which *does* take into account the jury's decision. By improperly focusing on whether the crime committed by Moore meets the legal definition of armed robbery, the majority completely loses sight of the vast difference between a "robbery gone bad" and a planned and premeditated murder. In fact, numerous other state appellate courts have found this distinction significant, if not dispositive in their comparative proportionality review. For example, the Florida Supreme Court determined a death sentence was disproportionate where multiple individuals planned a robbery of a coin laundry, armed themselves beforehand, pistol-whipped a witness once inside the store, and fired one fatal shot at the owner after being informed he had no money. In undergoing its proportionality review, the court noted it must "discretely analyze the nature and weight of the underlying facts; we do not engage in a 'mere tabulation' of the aggravating and

mitigating factors." *Scott v. State*, 66 So. 3d 923, 935 (Fla. 2011) (quoting *Terry v. State,* 668 So. 2d 954, 965 (Fla. 1996)).[7] In doing so, the court commented,

> Although not precisely like the "robbery gone bad" cases where we have reduced the sentence of death to life, *see, e.g., Jones v. State,* 963 So. 2d 180, 188–89 (Fla. 2007); *Terry,* 668 So. 2d at 965–66, there is no evidence in this case that Scott planned to shoot any of the individuals inside the coin laundry prior to doing so, and therefore this murder could be viewed as a reactive action in response to the victim's resistance to the robbery.

*Id.* at 937.

In a case closer to a true "robbery gone bad," the Florida Supreme Court concluded a death sentence was disproportionate where an individual walked into a convenience store armed, pocketed the weapon upon nearing the cashier, took money from the register, and began to walk towards the front door. However, after the clerk made a sudden movement, the robber pulled his weapon and fired two shots, killing the clerk. The court reversed the death sentence, noting "[t]here was no indication that murdering [the clerk] was part of Yacob's original robbery plan." *Yacob v. State*, 136 So. 3d 539, 550 (Fla. 2014), *abrogated by Lawrence v. State*, 308 So. 3d 544 (Fla. 2020). In an inexplicable contrast to South Carolina, Florida has reversed a death sentence based on comparative proportionality review at least a dozen times. *See Johnson v. State*, 720 So. 2d 232, 238 (Fla. 1998) (vacating a death sentence where the defendant murdered a victim during a burglary); *Terry v. State*, 668 So. 2d 954, 965 (Fla. 1996) (vacating the death sentence despite little mitigation and because evidence suggested it was a "robbery gone bad" case); *Thompson v. State*, 647 So. 2d 824, 827 (Fla. 1994) (finding a death sentence disproportionate where the defendant entered a Subway store, spoke to the clerk,

---

[7] Against a vigorous dissent, the Florida Supreme Court recently abandoned comparative proportionality review because a majority determined that since its responsibility to ensure that a sentence is not disproportionate stemmed from case law—as opposed to a creature of statute like ours—it was bound to follow the United States Supreme Court's jurisprudence that did not require this type of review. *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020). Regardless, prior Florida cases analyzing comparative proportionality review are still persuasive as they demonstrate the distinction between cold and calculated murders versus "reactive" ones that ordinarily result in a life sentence.

fired one fatal shot, stole $108, and fled the scene); *Sinclair v. State*, 657 So. 2d 1138, 1143 (Fla. 1995) (vacating death sentence where the defendant entered a taxi cab with a weapon and murdered the driver rather than pay the cab fare); *Clark v. State*, 609 So. 2d 513, 515 (Fla. 1992) (vacating a death sentence where the defendant fatally shot an individual and took the victim's money and boots afterwards, which the court characterized as "incidental to the killing, not a primary motive for it"); *McKinney v. State,* 579 So. 2d 80 (Fla. 1991); *Lloyd v. State,* 524 So. 2d 396 (Fla. 1988); *Proffitt v. State,* 510 So. 2d 896 (Fla. 1987); *Caruthers v. State,* 465 So. 2d 496 (Fla. 1985); *Rembert v. State,* 445 So. 2d 337 (Fla. 1984). While there are certainly differences between these cases, all of them are more egregious than Moore's in one important respect: every perpetrator began the robbery or burglary armed at the inception—unlike Moore—yet *still* their death sentences were determined to be disproportionate. In my view, entering a convenience store unarmed falls well short of engaging in a cold, calculated, and premeditated murder. While tragic and heinous to the victim and his family, Moore's crime does not represent the "worst of the worst" in terms of those murders reserved for the death penalty. *Glossip v. Gross*, 576 U.S. 863, 920–21 (2015) (Breyer, J., dissenting) ("Every murder is tragic, but unless we return to the mandatory death penalty struck down in *Woodson* . . . the constitutionality of capital punishment rests on its limited application to the worst of the worst . . . ."); *Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'") (*quoting Atkins v. Virginia*, 536 U.S. 304, 319 (2002))).

Florida is not alone in vacating multiple death sentences through its comparative proportionality review. Unlike the path taken by this Court over the years, the North Carolina Supreme Court has found at least eight death sentences disproportionate during the modern era.[8] *See State v. Roache*, 595 S.E.2d 381, 435

---

[8] A recent study by a professor at Appalachian State University noted that upwards of 23.5% of death sentences in North Carolina could be considered disproportionate. *See* Matthew Robinson, *The Death Penalty in North Carolina, 2021*, APP. STATE UNIV. (June 2021), https://gjs.appstate.edu/sites/ default/files/asu_profile_files/nc_death_penalty_2021_by_dr_matthew_robinson_f inal.pdf. While many people, including judges, may disagree over whether a sentence is proportionate, thus rendering it nearly impossible to settle on a specific

(N.C. 2004) (listing the eight cases where a death sentence was determined to be disproportionate); *see also State v. Benson*, 372 S.E.2d 517, 523 (N.C. 1988) (vacating a death sentence after noting the vast majority of robbery-murders end with life sentences and of those that end with death sentences, the vast majority involve multiple victims), *abrogated on other grounds by State v. Hooper*, 591 S.E.2d 514 (N.C. 2004). Moreover, state supreme courts in Georgia, Louisiana, Mississippi, Missouri, New Mexico, Tennessee, and Utah have all vacated at least one death sentence pursuant to comparative proportionality review.[9]

In the nearly thirteen years I have served on this Court, I have voted to affirm eleven death sentences on direct appeal and have never dissented. Starting with those cases that involved armed robbery, it is readily apparent this case is an outlier. For example, in *State v. Starnes*, 388 S.C. 590, 594, 698 S.E.2d 604, 606 (2010), the defendant fatally shot two of his friends, removed items from their pockets, transported their bodies in the trunk of his car to another location, and later kicked and urinated on their corpses. *Id.* at 594, 698 S.E.2d at 606-07. In finding the death sentence proportional, the Court cited two armed robbery cases resulting in multiple murders, and a single murder armed robbery case committed in the course of kidnapping and burglary. *Id.* at 603, 698 S.E.2d at 611. In *State v. Torres*, 390 S.C. 618, 621-22, 703 S.E.2d 226, 227-28 (2010), police conducted a welfare check after discovering a single vehicle accident involving a van. Once law enforcement arrived at the house of the van's owner, they discovered a husband and wife murdered. The

---

percentage of cases, the fact that this Court has never found a single case disproportionate when many other courts have is stunning.

[9] *See Ward v. State*, 236 S.E.2d 365, 368 (Ga. 1977); *State v. Holliday*, __ So. 3d __, 2020 WL 500475 (La. 2020) (noting only one time has a death sentence been vacated as disproportionate in Louisiana); *Coleman v. State*, 378 So. 2d 640, 650 (Miss. 1979); *State v. McIlvoy*, 629 S.W.2d 333, 342 (Mo. 1982) (vacating a death sentence as disproportionate notwithstanding the fact that the jury's decision was not the result of passion, prejudice, or any other arbitrary factor, and evidence supported the aggravating factors charged to the jury); *Fry v. Lopez*, 447 P.3d 1086, 1111 (N.M. 2019); *State v. Godsey*, 60 S.W.3d 759, 793 (Tenn. 2001) (invalidating a death sentence based on disproportionality where "the circumstances . . . are substantially less egregious, overall, than the circumstances of similar cases in which a sentence less than death has been imposed"); *State v. Gardner*, 789 P.2d 273, 279 (Utah 1989).

jury found the defendant guilty of two counts of armed robbery; two counts of murder; one count of burglary of a dwelling, first degree; one count of attempt to burn; and one count of criminal sexual conduct, first degree, resulting in a sentence of death. *See also State v. Justus*, 392 S.C. 416, 417, 709 S.E.2d 668, 669 (2011) (upholding a death sentence as proportional where the defendant, who was serving two life sentences for murdering two convenience store clerks during separate armed robberies, stabbed another inmate eleven times, including a fatal wound to the heart); *State v. Stanko*, 402 S.C. 252, 288, 741 S.E.2d 708, 727 (2013) (affirming appellant's murder and armed robbery convictions and death sentence), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019).

In *State v. Bryant*, 390 S.C. 638, 639, 704 S.E.2d 344, 344 (2011), one need look no further than the opening paragraph of the facts section to realize the death penalty was justified, as Justice Pleicones noted:

> Appellant began a crime spree with a first degree burglary on October 5, 2004. By the time the spree ended eight days later, appellant had committed three murders, assault and battery with intent to kill (ABIK), two more burglaries, and arson. While incarcerated awaiting trial, appellant threatened a correctional officer and subsequently attacked and seriously injured another.

*Id.* The three murders were particularly heinous. Bryant killed his first victim, leaving him on a rural road. *Id.* at 640, 704 S.E.2d at 345. After stealing from the victim's trailer, Bryant set it on fire. *Id.* A couple days later, Bryant killed his second victim, shooting him nine times and looting his house. *Id.* Bryant even answered several calls from the victim's wife and daughter, informing both of them he had killed their loved one. *Id.* Bryant burned that victim with a cigarette butt and left two notes indicating he planned to kill again. *Id.* Two days later, Bryant shot and killed his third victim, who was discovered by a hunter along a rural road. *Id.*

Coincidently, the first capital case reviewed under our modern statutory scheme involved the aggravating circumstance of armed robbery, but the facts paint a significantly more gruesome picture. *State v. Shaw*, 273 S.C. 194, 197, 255 S.E.2d 799, 800 (1979), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). There, the defendant, joined by two friends, spent an afternoon consuming drugs and alcohol before deciding "to see if we could find a girl to rape." *Id.* at 197, 255 S.E.2d at 801 (quoting one of the perpetrators). After locating a teenage couple in a car, the three friends stole the male's wallet, shot and killed him,

and ordered the female into their vehicle. *Id.* at 197-98, 255 S.E.2d at 801. The group drove to another location, raped the victim at least four times, and shot and killed her. *Id.* at 198, 255 S.E.2d at 801. They returned to where they shot the male to verify that he was dead, and the defendant later went back to where he killed the female victim and subsequently mutilated her body. *Id.*

And today, I voted to affirm the death sentence of Jerome Jenkins, who brutally murdered a store clerk during an armed robbery. *State v. Jenkins*, Op. No. 28089 (S.C. Sup. Ct. filed April 6, 2022) (Howard Adv. Sh. No. 12 at 46, 71). Unlike Moore, Jenkins and two others collectively scouted a convenience store, subsequently entered it wearing masks, and armed themselves with pistols before Jenkins shot and killed the clerk. *Id.* at 48. During sentencing, the State introduced evidence that three weeks after the armed robbery, Jenkins carried out two more robberies within hours of each other using the same *modus operandi*, which left another clerk dead. *Id.* at 47,48.

Other cases before the Court during my tenure are also more appreciably heinous. *See State v. Dickerson*, 395 S.C. 101, 108, 716 S.E.2d 895, 899 (2011) (affirming a death sentence where the defendant tortured his former friend to death for a period of eighteen to twenty-four hours, including "choking, being tied up and placed in a closet, being sodomized with a gun and a broomstick, having his scrotum burned, being hit with a heavy vase and a mirror, and generalized beating and cutting," all resulting in over 200 wounds to his body); *State v. Inman*, 395 S.C. 539, 544, 720 S.E.2d 31, 34 (2011) (finding a death sentence proportional where the defendant pled guilty to murder, first-degree burglary, first-degree criminal sexual conduct, and kidnapping of a Clemson University student who he strangled with a bathing suit); *State v. Motts*, 391 S.C. 635, 640, 707 S.E.2d 804, 806 (2011) (holding a death sentence was proportionate where the defendant, who was serving a life sentence for the murders of his great-aunt and great-uncle committed during an armed robbery, murdered his cell mate); *State v. Blackwell*, 420 S.C. 127, 134-35, 801 S.E.2d 713, 716-17 (2017) (upholding a death sentence as proportional where the defendant kidnapped and killed the daughter of his ex-wife's boyfriend); *State v. Cottrell*, 421 S.C. 622, 646, 809 S.E.2d 423, 436 (2017) (finding a death sentence proportional where the defendant murdered a police officer). Admittedly, these cases are outside the context of an armed robbery, but they involve truly gruesome crimes warranting capital punishment.

Moreover, on Moore's direct appeal, the cases this Court relied on are significantly more egregious than the facts here.[10] Unlike Moore, all of the defendants were armed at the inception and committed planned, premediated armed robberies that resulted in the death of at least one individual. While there have been individuals executed based on killing a single victim during the commission of an armed robbery, that alone is not dispositive. Even accepting the premise that such a case qualifies for capital punishment—which I do—I have not found any other case involving a defendant receiving the death penalty where he entered the place of business unarmed. Indeed, the State specifically conceded at oral argument that it could not cite to *any* case in our state with this distinguishing fact. This striking concession, which I believe supports my position that Moore's death sentence is disproportionate, is ignored by the majority and in my view, seriously undermines the suggestion that Moore's sentence is sufficiently similar to other cases to warrant capital punishment. *See generally Godfrey*, 446 U.S. at 433 ("There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not.").

Respectfully, the majority's decision to dwell on the fact that Moore's crime meets the legal definition of armed robbery and that evidence supports the jury's findings of aggravating circumstances, while ignoring the State's stunning admission and the precedent elsewhere, is wrong. In my view, the majority's analysis belongs in Moore's direct appeal, not in this petition for habeas directed at proportionality review. In concluding that evidence supported the jury's determination that an armed robbery had occurred and the presence of aggravating circumstances, we shirk our statutory responsibility to conduct an in-depth comparative proportionality review and serially affirming death sentences becomes a self-fulfilling prophecy. *See*

---

[10] I do not believe this Court's finding on direct appeal is automatically dispositive in this habeas proceeding, as fundamental tenets of justice must transcend principles of finality when capital punishment is involved. *See Sanders v. United States*, 373 U.S. 1, 8 (1963) ("Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged . . . . The inapplicability of res judicata to habeas, then, is inherent in the very role and function of the writ."); *Clark v. Tansy*, 882 P.2d 527, 532 (N.M. 1994) ("We hold that when a habeas petitioner can show that there has been an intervening change of law or fact, or that the ends of justice would otherwise be served, principles of finality do not bar relitigation of an issue adversely decided on direct appeal.").

*Dickerson*, 395 S.C. at 125 n.8, 716 S.E.2d at 908 n.8 (noting the "self-fulfilling prophecy" that comparative proportionality review has the risk to become); *Thomason v. State*, 486 S.E.2d 861, 874 (Ga. 1997) (Benham, J., concurring in part and dissenting in part) ("Exacerbating the risk of a faulty proportionality analysis is the doctrine of stare decisis: if we lower the standard in a single case, that case becomes precedent for easier and easier imposition of the most extreme punishment available in criminal jurisprudence.").

My focus on the majority's recitation of the jury's findings in no way should be read as disparaging the verdict of the jury. I fully acknowledge the jury's role in our judicial system is sacrosanct. Nevertheless, our responsibility, as established by the General Assembly, is to review the death sentence to ensure it is not "excessive or disproportionate to the penalty imposed in similar cases . . . ." S.C. Code Ann. § 16-3-25(C)(3). I believe this requires us to do more than simply recite the evidence supporting the jury's sentence. Indeed, the Supreme Court of Tennessee has characterized comparative proportionality review as "whether this case, taken as a whole, is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," and specifically rejected the state's contention that it is designed to determine "whether, viewing the entire record, the decision of the jury was based in reason as opposed to whim or prejudice." *State v. Godsey*, 60 S.W.3d 759, 787 (Tenn. 2001). Stated differently, the court noted "that reviewing the record in each case in isolation, as the State suggests, is not the appropriate analysis when conducting *comparative* proportionality review." *Id.* (emphasis in original).

This case also highlights the unsettling constitutional waters which surround the death penalty. The majority appropriately identifies the General Assembly's role in setting forth the list of aggravating circumstances that qualify an individual for capital punishment, and the solicitor's role in electing to pursue the death penalty in an eligible case. Where I part company with the majority is in its view that the Court has no role in those two arenas. While on the surface that is correct, it is equally true that in order for a punishment to pass constitutional muster, it must not be imposed arbitrarily. Accordingly, I believe this Court has a responsibility to illuminate how our capital punishment scheme is actually functioning in practice.[11] Unfortunately,

---

[11] Indeed, at oral argument, one Justice noted the various factors at play in whether a solicitor pursues the death penalty, including the resources available, the historical likelihood of obtaining a death sentence from the jury, the number of other crimes

but not surprisingly, Moore's case highlights many of the pitfalls endemic to the death penalty, beginning with the role race plays.

Moore's death sentence is a relic of a bygone era, where he was convicted by a jury comprised of eleven Caucasians and one Hispanic. No African Americans served on the jury, despite several being included in the jury pool. Alarming statistics also surface when reviewing the race of the victim. From 1985 to 2001, there were twenty-one cases in Spartanburg County where a death notice was filed, and in all but one the victim was white.[12] As Moore highlights in his petition for habeas relief, during the first eight years of that timeframe, the solicitor's office sought the death penalty in 43% of death eligible cases involving a white victim but not once in a case with a black victim. *See Simpson v. Moore*, No. 98-CP-42-1911, PCR Tr. (Dec. 10,

---

that requires prosecuting, the county where the crime occurred, and other similar considerations. Significantly, one state supreme court recently declared its capital punishment scheme unconstitutional precisely due in part to these same variables, as well as race, which lead to an unconstitutionally acceptable rate of arbitrariness. *See State v. Gregory*, 427 P.3d 621, 627 (Wash. 2018) ("[T]he use of the death penalty is unequally applied—sometimes by where the crime took place, or the county of residence, or the available budgetary resources at any given point in time, or the race of the defendant."). Moreover, at least one member on the United States Supreme Court believes these variables seriously undermine the constitutionality of capital punishment. *See Glossip*, 576 U.S. at 918 (Breyer, J., dissenting) ("Such studies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often *do*.") (emphasis in original).

[12] Shockingly, in the one capital case involving black victims, the solicitor admitted considering potential backlash from the African American community if the office did not pursue the death penalty in that case due to the decision to pursue a death sentence in a similar case with white victims. That defendant subsequently was granted post-conviction relief due in part to the evidence demonstrating race played a role in pursuing the death penalty. Order Granting Relief, *Kelly v. State*, No. 99-CP-42-1174 (Ct. Common Pleas, Oct. 6, 2003).

2001). According to one law professor and statistician, the statistical likelihood of race not contributing to this disparity is six in ten thousand. *Id.*

South Carolina is not unique in this as similar findings persist across our nation, with studies demonstrating the death penalty is disproportionately sought in cases involving white victims. *See generally* Steven F. Shatz and Terry Dalton, *Challenging the Death Penalty with Statistics:* Furman*, McCleskey, and A Single County Case Study*, 34 CARDOZO L. REV. 1227, 1246 (2013) ("Since *McCleskey*, there have been numerous empirical studies focused on racial disparities in death-charging and death-sentencing, and virtually all found significant racial disparities in death-charging, death-sentencing, or both."). Further, as the amicus brief starkly notes, "From 1930 until 1972, approximately half of the people sentenced to death and executed for homicide in the United States were Black. During this same period, 455 men were executed for rape across the United States—405, or 89.1%, of them were Black, and they were virtually all convicted of raping white women." Brief of NAACP Legal Defense and Educational Fund, Inc. as *Amicus Curiae* 7. South Carolina's statistics are equally troubling dating back to 1912 when official records began. Of the 282 people that have been executed since then, 208, or 74% were black and 74, or 26% were white. *Death Row/Capital Punishment*, S.C. DEP'T. OF CORRECTIONS (last visited March 31, 2021), http://www.doc.sc.gov/news/deathrow.html#execution. While our state has substantially reduced the level of bias in the modern era,[13] the foundation of our capital punishment scheme is deeply rooted in racial disparity. I fully acknowledge the Supreme Court has held that general patterns of racial discrimination are not enough to prove an arbitrary sentence, *see McCleskey v. Kemp*, 481 U.S. 279, 317-19 (1987), but it is disingenuous to discount the factor race plays.

Race is not the only factor that leads to bona fide questions as to whether our capital sentencing scheme is capable of being conducted in a constitutionally

---

[13] In South Carolina, executions in the modern death penalty era resumed in 1985, and since then, forty-three people have been executed. Of those, twenty-seven, or 63% were white while sixteen, or 37% were black, which more closely approximates the racial makeup in our state. *Execution Database*, DEATH PENALTY INFO. CTR., (last visited March 31, 2021), https://deathpenaltyinfo.org/executions/execution-database?filters%5Bstate%5D=South%20Carolina. *See also QuickFacts*, U.S. CENSUS BUREAU (July 1, 2019), https://www.census.gov/quickfacts/SC (estimating 64% of our state's population is white and 27% is black).

permissible manner. Gender—of both the defendant and the victim—plays a substantial role as well. *See* Shatz & Dalton, *supra*, at 1251 (noting gender disparities are present in both the gender of the defendant and of the victim, and recounting that "although women constitute 10% of those arrested for murder, they constitute only 2% of those sentenced to death at trial, and only 1% of those actually executed"). Additionally, the geography or location of where the criminal offense occurs significantly affects whether similar offenses are treated in a likewise manner. *Id.* at 1253-54 (noting that one South Carolina study on the role of geography in death penalty charging revealed "tremendous variation in death-charging rates that, applying a regression model, could not be explained by any of the legitimate or illegitimate variables"). Further, at the outset of a decision to seek the death penalty, budgetary restrictions and other considerations may influence whether a death-eligible case proceeds accordingly. After sentencing, the lengthy period an inmate spends on death row is staggering. Of the thirty-five inmates currently on death row, three were sentenced to death in the 1980s, eight during the 1990s, and twenty-four during the 2000s. *Death Row Roster*, S.C. DEP'T. OF CORRECTIONS (March 31, 2021), http://www.doc.sc.gov/news/death-row-report.pdf. Thus, almost one-third of the individuals have spent over twenty years on death row, and some more than thirty-five years. Because our state has not carried out an execution in over a decade, nearly 92% of inmates have been confined to death row for at least a dozen years. It could be persuasively argued—and indeed has been argued by the participants in the system, most especially the victims and their families—that our system of capital punishment is broken. Perhaps Justice Marshall was correct over forty years ago when he stated that "[t]he task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform." *Godfrey*, 446 U.S. at 440 (Marshall, J., concurring).

In conclusion, I completely support the majority's decision to expand the pool of cases relevant to our comparative proportionality review. I share the sentiments of Justice Labarga on the Florida Supreme Court, who noted,

> As a Court, and as individual Justices, we are called upon to either affirm or reverse the most severe penalty that can ever be imposed on a human being. That is a responsibility that must be carried out in a manner that gives the Court, as a whole, and each Justice individually, moral and legal certainty that the defendant is deserving of the ultimate penalty when the facts of the crime, the aggravating circumstances,

and the mitigating circumstances are carefully considered. This, in my view, is necessary to ensure that the penalty is imposed fairly and consistently throughout the State.

*Yacob*, 136 So. 3d at 557 (Fla. 2014) (Labarga, J., concurring), *abrogated by Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).  However, I believe that review should begin with this case and that Moore's sentence of death should be held disproportionate to the facts surrounding his crime.  The death penalty should be reserved for those who commit the most heinous crimes in our society, and I do not believe Moore's crimes rise to that level. Because I believe Moore's death sentence is disproportionate, I would grant habeas relief and vacate it. Accordingly, I concur in part and dissent in part.