698 S.E.2d 604

**The STATE, Respondent,**

v.

**Norman STARNES, Appellant.**

**No. 26868.**

Supreme Court of South Carolina.

Heard March 4, 2010.
Decided Aug. 16, 2010.
Rehearing Denied Sept. 22, 2010.

Senior Appellate Defender Joseph L. Savitz, III, and Appellate Defender Elizabeth Franklin–Best, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General S. Creighton Waters, of Columbia, and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

Justice KITTREDGE.

This is a direct appeal in a death penalty case. Appellant Norman Starnes was charged with the murder of Bill Welborn and Jared Champlain.[1] At trial, Appellant represented himself. A jury found Appellant guilty of both murders and recommended the death penalty. In this direct appeal, Appellant argues the trial court erred in failing to give a voluntary manslaughter charge, raises issues regarding a capital defendant's right to self-representation, and asserts he did not knowingly and voluntarily waive his right to counsel. We affirm.

## I.

Appellant owned a restaurant ("the restaurant") in Pelion, South Carolina. On January 8, 1996, Bill Welborn and Jared Champlain, friends of Appellant, came into the restaurant to eat and eventually left with Appellant to go to a local bar. When Bill and Jared did not return home that night, their girlfriends filed missing person reports. Police investigated the men's disappearance, but were unable to establish any leads until May 1996 when Appellant's girlfriend, Gwen Ott,

---

1. This was Appellant's second trial. We reversed Appellant's convictions and death sentence from his first trial due to the trial court's failure to give certain jury instructions. *State v. Starnes,* 340 S.C. 312, 531 S.E.2d 907 (2000).

contacted police and told them Appellant had killed Bill and Jared.

Gwen was working at the restaurant on January 8. After Appellant, Jared, and Bill left the restaurant, Appellant returned twice to get money out of the cash register. Appellant returned a third time with a mark on his temple and appeared very upset. He told Gwen that Bill had pistol-whipped him in the bathroom of the bar. Appellant retrieved his gun and bullets from a shelf in the kitchen and told her he was going to kill "them." When Appellant returned later, he told Gwen, "Let's go, that they were dead."

Gwen testified Appellant drove her to his house, where she saw Jared's body in the front room and Bill's body in the bedroom. Appellant told Gwen that Jody Fogle had come over to facilitate a drug transaction and he saw Jared pull a gun on Jody. Appellant admitted to Gwen that he shot Jared and Bill. Gwen testified that Appellant removed all items from the men's pockets, placed the bodies in the trunk of his car, and cleaned the blood from the house before leaving. Appellant returned later that night and asked Gwen to follow him in a separate car to his uncle's property. When they arrived at the property, Gwen saw Jared's and Bill's bodies around the back of the house. Appellant kicked and urinated on the bodies, loaded them into the back of a pickup truck, and took them to the back of the woods on the property. During the drive home, Appellant threw his gun into the Edisto River.

From January until the bodies were discovered in May, Appellant assisted law enforcement in the search for the victims, even appearing on television pleading for any evidence that would help find his friends. Also during this period, Appellant received word of a foul odor on his uncle's farm. Appellant returned to his uncle's property, dug up the graves, and covered the bodies with lime in an effort to hide the smell. As noted, Gwen's tip led to the discovery of the bodies and the charges against Appellant.

Appellant elected to represent himself at trial and to testify in his own defense. Appellant testified that after he, Jared, and Bill left the restaurant, they went to a local bar. While in the bar's restroom, Bill came up behind Appellant, grabbed his

throat, put a metal object to the back of his head,[2] and began yelling at Appellant about money Appellant allegedly stole from him. Later, Bill remarked to one of the bar's employees that she "better call the police because he was going to take [Appellant] up on Platt Springs Road and blow his F"in brains out." [3]

After the three men left the bar, Bill told Appellant to take him to Jody's house to get drugs. Instead, Appellant dropped Bill and Jared off at Appellant's house and then picked up Jody and brought him back to the house. Appellant testified he heard Jared cussing and saw him pointing a gun at Jody. Appellant stated that he ran into the bedroom and retrieved his gun. As he exited the bedroom, Bill said "whoa" and was pointing a gun at him. Appellant testified he shot Bill, then he turned and shot Jared.

The defense called Jody to testify. On direct examination, Jody testified that Jared pulled a gun on him and asked him: "[W]here is the dope?" Jared told Jody he would kill him. Jody testified that Bill took the gun from Jared, and then Appellant shot them. On cross-examination, Jody admitted that Appellant unexpectedly arrived at his house and asked Jody to come back to his house to "watch his back" because he was having trouble with Bill and Jared. Appellant asked Jody if he had a gun with him, but Jody said he did not. Jody testified when he and Appellant arrived at the house, Appellant immediately went into the bedroom and began fumbling around. Jody maintained that Jared charged at him with the gun, but stated Bill took the gun from Jared and everyone calmed down. Jody testified Appellant came out of the bedroom and fired three shots at Bill and then fired at Jared. Jody demanded Appellant take him home.[4]

---

2. Appellant testified the object could have been a gun or a cigarette lighter.

3. This employee testified for the defense and confirmed that Bill made this remark. She further testified she had heard a scuffle in the bathroom prior to this remark, which was apparently the earlier exchange between Bill and Appellant.

4. Jody was convicted of two counts of accessory to murder.

The trial court charged the jury on murder and self-defense, but refused to charge voluntary manslaughter. The jury found Appellant guilty of both murders. In the sentencing phase, the trial court gave three statutory aggravating circumstances charges: 1) the defendant committed the murders while in the commission of robbery while armed with a deadly weapon; 2) the defendant committed the murders while in the commission of larceny while armed with a deadly weapon; and 3) two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct. Additionally, the trial court gave four statutory mitigating circumstances: 1) the defendant had no significant criminal history; 2) the victims were participants in the defendant's conduct or consented to the act; 3) the defendant acted under duress or domination of another person; and 4) the defendant was provoked by the victims into committing the murders. The jury found the existence of all three aggravating circumstances beyond a reasonable doubt and recommended the death penalty.

## II.

Appellant argues the trial court erred in failing to charge the jury on the law of voluntary manslaughter. We disagree. Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *State v. Wharton*, 381 S.C. 209, 214, 672 S.E.2d 786, 788 (2009).

To warrant the court eliminating the charge of manslaughter, there must be no evidence whatsoever tending to reduce the crime from murder to manslaughter. *Id.* If there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge. *Dempsey v. State*, 363 S.C. 365, 371, 610 S.E.2d 812, 815 (2005).

We have consistently held that both heat of passion and sufficient legal provocation must be present at the time of the killing. *Wharton*, 381 S.C. at 215, 672 S.E.2d at 788. A defendant is not entitled to a voluntary manslaughter charge merely because he was in a heat of passion. *See id.* (holding the State's request for a voluntary manslaughter charge was

not warranted where there was no evidence of sufficient legal provocation, although the defendant may have been acting under heat of passion). Conversely, a defendant is not entitled to voluntary manslaughter merely because he was legally provoked. *See State v. Pittman,* 373 S.C. 527, 576, 647 S.E.2d 144, 170 (2007) (holding although sufficient legal provocation arguably existed, there was no evidence the defendant was in a heat of passion). Moreover, there must be evidence that the heat of passion was caused by sufficient legal provocation.

Appellant bases his entitlement to a voluntary manslaughter charge on his testimony that when Bill pointed a gun at him, he felt threatened and was in fear. Appellant argues the threat of an imminent deadly assault was sufficient to entitle him to a voluntary manslaughter charge. Appellant cites to several cases from this Court to support this argument.

The State, which concedes the propriety of the self-defense charge, counters that our case law should not be read so broadly as to sanction a voluntary manslaughter charge that is based upon the mere testimony that the defendant was "afraid." While acknowledging that self-defense and voluntary manslaughter are not mutually exclusive, the State asserts "it does not follow that manslaughter should be charged simply because a defendant claiming self-defense testifies he was afraid." The State claims there was no evidence Appellant shot the victims in the heat of passion, and therefore, the trial court correctly refused to charge voluntary manslaughter.

Whether a voluntary manslaughter charge is warranted turns on the facts. If the facts disclose any basis for the charge, the charge must be given. Given Appellant's argument, which takes our case law and turns primarily fact-driven holdings into broad statements of law, we take this opportunity to clarify the law regarding how a defendant's fear following an attack or a threatening act relates to voluntary manslaughter.

Trial courts often struggle with the difficult interplay between murder and the lesser-included offense of voluntary manslaughter,[5] especially where a defendant claims he acted ·

---

**5.** We acknowledge courts have also struggled with the interplay of murder and involuntary manslaughter, especially when there is evidence of self-defense or accident.

in self-defense. This struggle may be due to this Court's opinions which, when taken out of the evidentiary context, appear to set no boundaries as to what circumstances give rise to "sudden heat of passion upon sufficient legal provocation." For example, in a particular fact setting, we have held an unprovoked attack with a deadly weapon or an overt threatening act can constitute sufficient legal provocation. *See State v. Knoten*, 347 S.C. 296, 307, 555 S.E.2d 391, 397 (2001) ("There can be little argument that an unprovoked knife attack constitutes sufficient legal provocation to warrant the requested [voluntary manslaughter] charge."); *Pittman*, 373 S.C. at 573, 647 S.E.2d at 168 ("This Court has previously held that an overt, threatening act or a physical encounter may constitute sufficient legal provocation.").

We also have held that fear resulting from an attack can constitute a basis for voluntary manslaughter. *See State v. Wiggins*, 330 S.C. 538, 549, 500 S.E.2d 489, 495 (1998) ("[F]ear can constitute a basis for voluntary manslaughter."). Yet the presence of fear does not end the inquiry regarding the propriety of a voluntary manslaughter instruction. We have consistently held that sudden heat of passion upon sufficient legal provocation is defined as an act or event that "must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *Pittman*, 373 S.C. at 572, 647 S.E.2d at 167. While the act or event "need not dethrone the reason entirely, or shut out knowledge and volition," it must cause a person to lose control. *Id.*

■■ We reaffirm the principle that a person's fear immediately following an attack or threatening act may cause the person to act in a sudden heat of passion. However, the mere fact that a person is afraid is not sufficient, by itself, to entitle a defendant to a voluntary manslaughter charge. Consistent with our law on voluntary manslaughter, in order to constitute "sudden heat of passion upon sufficient legal provocation," the fear must be the result of sufficient legal provocation **and** cause the defendant to lose control and create an uncontrollable impulse to do violence. Succinctly stated, to warrant a

voluntary manslaughter charge, the defendant's fear must manifest itself in an uncontrollable impulse to do violence.

A person may act in a deliberate, controlled manner, notwithstanding the fact that he is afraid or in fear. Conversely, a person can be acting under an uncontrollable impulse to do violence and be incapable of cool reflection as a result of fear. The latter situation constitutes sudden heat of passion, but the former does not. Evidence that fear caused a person to kill another person in a sudden heat of passion will mitigate a homicide from murder to manslaughter—it will not justify it. This is the distinction between voluntary manslaughter and self-defense. We reiterate that evidence of self-defense and voluntary manslaughter may coexist and that a charge on self-defense **and** voluntary manslaughter may be warranted. *See State v. Gilliam*, 296 S.C. 395, 373 S.E.2d 596 (1988) (holding the evidence supported both a self-defense charge and a voluntary manslaughter charge).

Turning to the facts of this case, viewing the evidence in the light most favorable to Appellant, there is no evidence to support a voluntary manslaughter charge. Appellant testified when he turned around and saw Bill pointing a gun at him, "I shot Bill Welborn and then turned and shot Jared Champlin." He added, "I was scared and I was frightened. When Jared pulled the gun on Jody, it scared me." While this testimony is evidence that Appellant was in fear, there is no evidence Appellant was out of control as a result of his fear or was acting under an uncontrollable impulse to do violence. The only evidence in the record is that Appellant deliberately and intentionally shot Jared and Bill and that he either shot the men with malice aforethought or in self-defense.

Again, we emphasize self-defense and voluntary manslaughter are not mutually exclusive, and had there been evidence to support a finding of heat of passion upon sufficient legal provocation, Appellant would have been entitled to a voluntary manslaughter charge. The record is simply devoid of such evidence. In our view, to hold that Appellant was entitled to a voluntary manslaughter charge under the facts of this case would impermissibly blend the elements of voluntary manslaughter and self-defense. In effect, such a holding would render voluntary manslaughter a lesser-included offense of

self-defense, for where there is an intentional killing based on fear alone, a defendant would be entitled to a voluntary manslaughter charge.

For these reasons, we hold the trial court properly refused to charge voluntary manslaughter.

## III.

■ Appellant asks this Court to create a *per se* rule prohibiting capital defendants from representing themselves and to overturn *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998) and *State v. Brewer,* 328 S.C. 117, 492 S.E.2d 97 (1997) (both holding the defendant had a right to represent himself at his capital trial). We decline to do so.

■ The South Carolina Constitution provides that every criminal defendant has the right to represent himself and makes no distinction between capital and non-capital defendants. *See* S.C. Const. art. 1, § 14. Additionally, the United States Supreme Court has interpreted the United States Constitution as providing a right to self-representation. *See Faretta v. California,* 422 U.S. 806, 821, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The Sixth Amendment, when naturally read, thus implies a right of self-representation."). The right to self-representation, however, is not absolute. The Constitution allows states to prohibit defendants from waiving their right to counsel if they are not competent to conduct trial proceedings by themselves. *See Indiana v. Edwards,* 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (holding a defendant may be competent enough to stand trial but not competent enough to waive his Sixth Amendment right to counsel and represent himself). Nevertheless, we believe a *per se* ruling forbidding capital defendants from representing themselves would violate both the South Carolina and United States Constitutions. Therefore, we decline Appellant's request to adopt such a rule in South Carolina.

## IV.

■ Appellant argues he did not knowingly and voluntarily waive his right to counsel during the sentencing phase of his trial. We disagree.

In order to waive the right to counsel, the accused must be (1) advised of his right to counsel, and (2) adequately warned of the dangers of self-representation. *Prince v. State,* 301 S.C. 422, 424, 392 S.E.2d 462, 463 (1990) (citing *Faretta,* 422 U.S. 806, 95 S.Ct. 2525).

Appellant's waiver of counsel was addressed several times prior to trial. In the initial pre-trial hearing regarding Appellant's motion to proceed *pro se,* the record indicates the trial court methodically and carefully explained the dangers of self-representation and ensured that Appellant understood the various issues that would arise at trial. The trial judge inquired into Appellant's mental state and his knowledge of numerous aspects of a trial, including procedural rules, elements of the charges against him, and available defenses. After engaging in the thorough *Faretta* colloquy, the trial judge granted Appellant's request. At subsequent hearings, Appellant first withdrew his motion to proceed *pro se,* then made a motion for hybrid representation, and finally moved again to proceed *pro se.* At the third and final hearing on the motion, the trial judge again sternly warned Appellant of the dangers of self-representation.[6]

We find Appellant knowingly and voluntarily waived his right to counsel. Appellant was well aware of procedures in a death penalty case and knew he would be representing himself in both the guilt phase and the sentencing phase of trial. This was Appellant's second capital trial, and he specifically indicated to the trial court during a pre-trial hearing that he knew the trial could only proceed to the penalty phase if the jury returned a guilty verdict for murder.

Appellant thoroughly questioned potential jurors during *voir dire* and explained to them that a jury would first have to find him guilty before they reached the penalty phase. Appellant made reasonable and persuasive arguments to the trial court resulting in the qualification of several jurors, specifically citing to a United States Supreme Court opinion for support.[7] Additionally, during the State's case in chief, Appellant

---

6. The trial court appointed the two lawyers who had represented Appellant at his first trial as stand-by counsel.

7. In *Wainwright v. Witt,* the United States Supreme Court held the critical issue regarding the disqualification of a juror in a capital case is

made proper and valid objections and conducted thorough cross-examinations of witnesses. In the presentation of his defense, Appellant called several witnesses, including the waitress who overheard Bill's threatening comments to Appellant, two witnesses who claimed they snorted methamphetamines and crystal meth with Bill three days before the killings, and Jared's fiancée who testified Bill was carrying a gun on the night of the killings.[8] Finally, in the mitigation phase of the trial, Appellant called several correctional officers to testify as to Appellant's good behavior, two ministers, several personal friends, and his mother.

We find Appellant had a clear understanding of the dangers of self-representation in the guilt phase and the sentencing phase of his trial, as the trial court repeatedly questioned him about his decision to represent himself. *See Wroten v. State,* 301 S.C. 293, 294, 391 S.E.2d 575, 576 (1990) (citing *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1065 (11th Cir.1986)) (recognizing that the ultimate test regarding the waiver of counsel is not the trial judge's advice; rather it is the defendant's understanding of the dangers inherent in self-representation). Accordingly, we hold Appellant knowingly and voluntarily waived his right to counsel.

## V.

Pursuant to S.C.Code Ann. § 16–3–25(C) (2003), we have conducted a proportionality review. We find the death sentence was not the result of passion, prejudice, or any other

"whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. 412, 433, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The State sought to disqualify those jurors who indicated they were more inclined to impose a life sentence. Appellant rebutted the State's request for disqualification by arguing, pursuant to *Wainwright,* these jurors did not say they could never give the death penalty and, therefore, should be qualified.

8. Jared's fiancée first testified she did not remember whether Jared had a gun with him on the night of the killings. Appellant impeached her testimony by providing her with a copy of the transcript from Appellant's first trial in which she testified Jared was carrying a gun. *See* Rule 613(b), SCRE (providing conditions where a prior inconsistent statement may be admitted).

arbitrary factor. Furthermore, a review of similar cases illustrates that imposing the death sentence in this case would be neither excessive nor disproportionate in light of the crime. *See State v. Vazsquez,* 364 S.C. 293, 613 S.E.2d 359 (2005) (involving a double murder committed in the course of a robbery); *State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721 (2000) *overruled on other grounds by Rosemond v. Catoe,* 383 S.C. 320, 680 S.E.2d 5 (2009) (involving a double murder committed in the course of a burglary); *State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260 (1996) (imposing the death penalty where murder was committed in the course of kidnapping, burglary, and robbery).

We affirm Appellant's convictions and sentence.

**AFFIRMED.**

TOAL, C.J., BEATTY and HEARN, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent. I believe the trial court erred in failing to charge the jury on voluntary manslaughter. Consequently, I would reverse and remand for a new trial.

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *See State v. Wharton,* 381 S.C. 209, 214, 672 S.E.2d 786, 788 (2009). "In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *See State v. Gardner,* 219 S.C. 97, 104, 64 S.E.2d 130, 134 (1951). "To warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *Wharton,* 381 S.C. at 214, 672 S.E.2d at 788.

At trial, the following evidence was presented from which the jury might have determined that Appellant committed manslaughter: testimony that, earlier in the day, Bill ap-

proached Appellant from behind, grabbed his throat, and put a metal object to his head; testimony that Bill said in Appellant's presence that he was going to take Appellant out on Platt Springs Road "and blow his F"in brains out;" Appellant's testimony that Bill and Jared were under the influence of methamphetamine on the night in question; and Appellant's testimony that Bill pointed a gun at Appellant just before Appellant shot him. Additionally, Appellant testified that he "didn't kill [Bill and Jared] with malice aforethought, with premeditation. . . . I was scared and I was frightened."

In my view, given the above evidence, it cannot be said that there was clearly "no evidence whatsoever tending to reduce the crime from murder to manslaughter." The jury could infer from the evidence that Appellant's fear resulted in an uncontrollable impulse to do violence. *Compare State v. Wiggins*, 330 S.C. 538, 549, 500 S.E.2d 489, 495 (1998) (holding that judge properly charged jury on voluntary manslaughter where defendant testified he was in fear of the threat of physical assault).

The majority apparently decides that the evidence does not yield an inference that Appellant's fear resulted in an uncontrollable impulse to do violence. This is not an unreasonable conclusion but, as some evidence tending to establish the offense of manslaughter was presented at trial, it is a conclusion that the jury, not this Court, must reach.

I do not suggest that a voluntary manslaughter instruction must be given whenever the defendant testifies that he was in fear. However, in light of all the evidence presented here, Appellant met the standard to warrant the charge. *Wharton*, 381 S.C. at 214, 672 S.E.2d at 788. I would reverse.