## THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Dominic A. Leggette, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2018-001793

_____

## ON WRIT OF CERTIORARI

_____

Appeal From Georgetown County
Paul M. Burch, Post-Conviction Relief Judge

_____

Opinion No. 6007
Heard December 5, 2022 – Filed August 2, 2023

_____

## AFFIRMED

_____

Appellate Defender Lara Mary Caudy, of Columbia, for
Petitioner.

Attorney General Alan McCrory Wilson and Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., of Columbia, both for Respondent.

_____

**MCDONALD, J.:** In this action for post-conviction relief (PCR), Petitioner
asserts the PCR court erred in finding trial counsel provided effective assistance of
counsel. Petitioner contends trial counsel was ineffective in failing to object to the
trial court's instruction on voluntary manslaughter as a lesser-included offense of

murder because the evidence presented at trial did not support a voluntary manslaughter charge. We affirm.

**Facts and Procedural History**

On August 9, 2008, Petitioner and several others from his uptown Andrews neighborhood were involved in a fight with Al Ingram and other men from the Andrews westside area. Groups from the two neighborhoods clashed again on August 11. According to testimony presented at trial, a longstanding conflict existed between these two neighborhoods, often culminating in fisticuffs.

On August 13, 2008, Officer Verney Cumbee of the Andrews Police Department (APD) responded to the scene of a shooting. When he arrived, he found approximately fifteen people surrounding Antonio Tisdale, a westside man with a gunshot wound to his chest. Several individuals at the scene reported that "Dominic just shot Tony." Tony Tisdale ultimately died from the gunshot wound.

Investigator Eddie Lee of the APD assisted in the investigation. Investigator Lee identified Petitioner as a suspect based on eyewitness testimony gathered from the scene. According to Investigator Lee, Al Ingram recognized Petitioner but did not know his name; Ingram knew only that he had seen him around town and in the neighborhood conflicts. Ingram subsequently identified Petitioner from a photo lineup and named him as the shooter.

In the meantime, Petitioner remained at large. Investigator Lee completed a fugitive form requesting the assistance of the United States Marshals Service, and Officer Cumbee subsequently arrested Petitioner on September 9, 2008. The Georgetown County grand jury later indicted Petitioner for murder and assault and battery with intent to kill (ABWIK).

At Petitioner's trial began before Judge Benjamin H. Culbertson, the State presented evidence showing Tisdale and Ingram, along with several others from their westside neighborhood, were at a nightclub on the night of the shooting. Ingram and Tisdale saw Petitioner from a distance and followed him as he walked away from a group of westside men. While the two men were following him, Petitioner turned and fired a gun several times, injuring Ingram and killing Tisdale.

The State also elicited testimony about prior fights between Ingram and Petitioner and between the rival neighborhoods. Both Ingram and Petitioner testified as to their involvement in a physical dispute about one year prior to the shooting.

Ingram admitted he participated in scuffles with Petitioner's neighborhood two and four days prior to the shooting; however, he maintained no weapons were involved on those occasions. Ingram claimed Petitioner was not present during the fight four days before the shooting and maintained he and Petitioner had not fought or threatened each other since the altercation the previous year.

Petitioner also recalled incidents between the rival neighborhoods, including lynchings and jumpings. However, Petitioner's testimony about the more recent encounters differed from Ingram's—Petitioner claimed he and Ingram indeed were involved in the fight four days before the shooting. He further noted he saw Ingram again two days before the shooting.

Additionally, both the State and Petitioner presented evidence regarding the moments leading up to the shooting. Ingram testified he saw Petitioner arguing with two or three people from Ingram's westside neighborhood and that as he approached Petitioner, he heard people say "there goes Al, there goes Al," which Ingram interpreted as an encouragement to fight. When Petitioner walked away from the first group of westside men, Ingram and Tisdale followed ten to fifteen feet behind him.[1] Ingram saw Petitioner turn and fire his weapon three or four times, but he did not see Petitioner with a gun prior to the shots. Ingram testified that he had no weapon, did not see Tisdale pull a weapon, and denied that he and Tisdale followed or yelled at Petitioner. Ingram further noted no other men from the rival neighborhoods were fighting the night of the shooting.

Jamar Mitchum, Tisdale's brother, also saw Petitioner that night. He heard no arguments or fights that evening but did see a few people near Petitioner. Mitchum testified that when Petitioner walked away from the area where Ingram and Tisdale were standing, Ingram and Tisdale followed behind him. He acknowledged he did not see the shooting; however, he heard three or four gunshots. He did not see Petitioner or anyone else with a weapon that night.

Just prior to the shooting, Craig Jackson was outside Carnell's Bar and Grill taking a break from work when he saw approximately ten men, including Tisdale, standing around outside. The men were not loud or rowdy, but Jackson heard someone say "[t]hat's Dominic right there" before Tisdale and Ingram walked toward Petitioner. When Tisdale and Ingram were approximately three feet behind Petitioner, Jackson saw Petitioner turn and start shooting. He did not hear Petitioner say anything and did not see any weapon other than Petitioner's gun.

---

[1] Ingram claimed he had no intention of fighting Petitioner that night.

Jackson testified he watched as Tisdale and Ingram walked away because he believed a fight would ensue.

Leron Gardner was with Petitioner the night of the shooting. He testified Ingram and Tisdale were standing in front of Carnell's as he and Petitioner walked past. According to Gardner, the group "just rushed up on us out of nowhere out of the blue" so Petitioner took off running. Gardner noted he was scared after Ingram and Tisdale chased after Petitioner. Gunshots followed after Petitioner ran down a side street, but Gardner could not see what happened. He did not see Ingram or Tisdale with a weapon.

Petitioner testified he received a call from his ex-girlfriend and had an "iffy" or "messed up feeling that something was going to happen" the night of the shooting. Despite his reservations, Petitioner and Gardner went out that night. Petitioner admitted he showed Gardner a gun, which he said he bought for protection because he was scared of Ingram due to the escalating situation between the two men. He explained that when he saw the westside group, he kept walking to avoid any confrontation, but he became scared when the men confronted him. Petitioner believed he was going to be jumped because the group formed a semi-circle around him, and one flagged down Tisdale and Ingram to tell them he was there. As Petitioner walked away, he heard someone come up behind him and ask, "What's up now?" Petitioner then turned around and saw the two men approximately three feet from him. When Petitioner saw Ingram reach toward his waist, he believed Ingram was reaching for a gun, so he pulled his own weapon, shot two or three times, and fled. Petitioner maintained he did not provoke Tisdale or Ingram that night. He noted he was already scared of Ingram due to their confrontation two days earlier, the escalating violence between the rival neighborhoods, and Ingram's reputation for carrying a gun. He further acknowledged his varying and contradictory statements to police after the shooting.

The trial court instructed the jury on murder, ABWIK, voluntary manslaughter, assault and battery of a high and aggravated nature (ABHAN), and self-defense. Trial counsel did not object to these instructions, and the charge conference was not on the record. After asking several questions and deliberating for nine hours over two days, the jury reported an impasse and the court gave an *Allen*[2] charge. Two and a half hours later, the jury found Petitioner guilty of the lesser-included offenses of ABHAN and voluntary manslaughter. The trial court sentenced

---

[2] *Allen v. United States*, 164 U.S. 492 (1896).

Petitioner to thirty years' imprisonment for voluntary manslaughter and ten years' imprisonment for ABHAN, to run concurrently.

Following a timely appeal, this court affirmed Petitioner's convictions and sentence. *State v. Leggette*, Op. No. 2012-UP-203 (S.C. Ct. App. filed March 28, 2012). The supreme court denied the petition for a writ of certiorari in Petitioner's direct appeal.

Petitioner subsequently filed an application for PCR, claiming ineffective assistance of counsel and "constitutional and statutory violation[s]." At his PCR hearing, Petitioner testified "there were amended stipulations that did not meet murder" and stated murder and voluntary manslaughter were "two different things" based "on the same acts." The State objected to Petitioner's "legal" testimony, and PCR counsel responded that Petitioner was trying to explain his understanding of the indicted offenses versus the charges on which the jury convicted him. The PCR court allowed Petitioner to address his belief that counsel was ineffective based on a misunderstanding of the law and due to "discrepancies" between the indicted offenses and the jury's verdict. Petitioner admitted trial counsel explained his initial charges but stated he "found out there were some stipulations that were not [conducive] with what [he was] . . . found guilty of." Petitioner also believed his voluntary manslaughter conviction did not warrant a thirty-year sentence.[3]

Petitioner further asserted trial counsel was ineffective in failing to call a character witness, whom he argued "would have proved to the courts that law enforcement was creating perjury when they were on the stand, because there were altercations that were going on since 2006." In light of this history, Petitioner believed the State's witnesses falsely portrayed the incident as an ambush killing. Petitioner set

---

[3] Trial counsel addressed the thirty-year sentence during his testimony at the PCR hearing, explaining, "If you're convicted, he (the trial judge) to my experience—if you're convicted at trial, to my experience he basically gives you every day he can." However, upon further questioning, trial counsel admitted he recalled the trial court stating during sentencing that "the biggest problem [the court had] with [Petitioner's] case is the fact that with [his] prior record by federal law [he was] prohibited from owning a firearm. In spite of that[, he] went and [he] purchased one illegally and then [he] carried it down there that night."

forth a litany of other areas in which he believed trial counsel was ineffective, including the failure to request a charge of involuntary manslaughter.[4]

Trial counsel testified he and Petitioner discussed the indictments and the possibility that the jury could find him guilty of a lesser-included offense. In trial counsel's opinion, the State failed to disprove self-defense or establish Petitioner's guilt beyond a reasonable doubt. He noted the jury deliberated for an "inordinate length of time" and likely reached a compromise verdict. Trial counsel believed he presented sufficient evidence of self-defense but questioned whether his jury charge requests were as strong as they would be in his current practice. Although trial counsel specifically referenced an instruction regarding Petitioner's right to act on appearances, he couched this concern as a "vague recollection." Neither the State nor PCR counsel asked trial counsel about the submission of voluntary manslaughter to the jury as a lesser-included offense or whether this was a legal strategy he discussed with Petitioner.

The PCR court denied relief and dismissed Petitioner's application, finding trial counsel was not ineffective in failing "to object to [Petitioner's] conviction for voluntary manslaughter." The PCR court found Petitioner failed to offer any support for his argument that voluntary manslaughter should not have been charged and noted it appeared Petitioner did "not recognize it as a lesser-included offense of murder." The court further concluded the record demonstrated "the voluntary manslaughter instruction was appropriate and supported by the facts" and found trial counsel was not ineffective with regard to Petitioner's other claims.

**Standard of Review**

"In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). An appellate court will "defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). However, an appellate court "review[s] questions of law de novo, with no deference to trial courts." *Id.* at 180–81, 810 S.E.2d at 839.

---

[4] Initially, Petitioner testified he believed trial counsel should have requested a charge of voluntary manslaughter, but when PCR counsel asked him about this more specifically, he responded, "I felt like he should have motioned for involuntary manslaughter when it came to Tisdale."

**Law and Analysis**

    **I. Issue Preservation**

At the outset of our analysis, we must contend with the imprecise allegations asserted in Petitioner's PCR pro se application for relief. Although his brief to this court ably sets out Petitioner's argument that trial counsel was ineffective in failing to object to the voluntary manslaughter charge, the argument before the PCR court was not so specific, leaving the PCR court to glean the deficiencies asserted from the pro se application and hearing testimony. Petitioner's arguments before the PCR court—that there were "discrepancies" between the indicted offenses and the offenses for which he was convicted and that he did not understand he could be convicted of an unindicted lesser-included offense—differ somewhat from his argument to this court that the evidence at trial did not support the voluntary manslaughter instruction. *See, e.g., State v. Freiburger*, 366 S.C. 125, 134, 620 S.E.2d 737, 741 (2005) (reiterating that an issue is not preserved for appellate review when one ground is raised to the trial court and a different ground is raised on appeal); *Mangal v. State*, 421 S.C. 85, 97, 805 S.E.2d 568, 574 (2017) (recognizing that in most PCR cases, our supreme court has "refused to excuse the pleading and issue-preservation requirements that apply in all civil cases").

While we recognize this initial lack of clarity lends weight to the State's preservation argument, we address the merits here in light of the arguments made before the PCR court, the PCR court's comprehensive analysis of the evidence supporting the voluntary manslaughter instruction, the lack of an amended application, and the failure of either party to ask trial counsel whether seeking the lesser-included charge was a strategic decision.[5] *See Atl. Coast Builders &*

---

[5] Neither party asked trial counsel about the voluntary manslaughter instruction, and trial counsel was most concerned about the jury's rejection of self-defense and the lengthy sentence imposed by the trial court. Because he was not asked the question, trial counsel was not able to explain why he failed to object to the instruction—if it was a failure at all. Because here, requesting a voluntary manslaughter instruction would have been a legitimate strategic attempt to mitigate the consequences of the sentence Petitioner faced on the murder charge if the jury were to reject his theory of self-defense, as it ultimately did. A murder conviction carries a sentence of thirty years to life (day-for-day) while the sentencing exposure for voluntary manslaughter is two to thirty years computed at 85%. S.C. Code Ann. § 16-3-20(A) (2015) (punishment for murder); § 16-3-50 (2015) ("A person convicted of manslaughter . . . must be imprisoned not more than thirty

*Contractors, LLC v. Lewis*, 398 S.C. 323, 330, 730 S.E.2d 282, 285 (2012) ("While it may be good practice for us to reach the merits of an issue when error preservation is doubtful, we should follow our longstanding precedent and resolve the issue on preservation grounds when it clearly is unpreserved.").

## II. The PCR Court's Analysis of the Lesser-Included Offense

Petitioner contends the PCR court erred in finding trial counsel was not ineffective in failing to object to the voluntary manslaughter instruction because the evidence presented at trial did not support the instruction. He asserts the evidence did not demonstrate he acted in the heat of passion because it did not show he was "out of control as a result of his fear," "was acting under an uncontrollable impulse to do violence," "lacked control over his actions," or was engaged in any argument or altercation with Tisdale. In Petitioner's view, the State failed to set forth evidence of sufficient legal provocation because although the evidence indicated Petitioner believed Ingram was reaching for a gun, the evidence did not show Tisdale committed an overt act or provoked Petitioner into firing his weapon. Petitioner asserts he was prejudiced because he contends the jury likely would have found he acted in self-defense had the voluntary manslaughter charge not been given and believes the jury reached a compromise verdict after deliberating for almost twelve hours and receiving an *Allen* charge. We disagree.

In order to establish a claim for ineffective assistance of counsel, a PCR applicant must show: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

"Whether a voluntary manslaughter charge is warranted turns on the facts. If the facts disclose any basis for the charge, the charge must be given." *State v. Starnes*, 388 S.C. 590, 597, 698 S.E.2d 604, 608 (2010). "To warrant the court eliminating

---

years or less than two years."). Challenging the voluntary manslaughter instruction at trial would have been a huge risk in light of Petitioner's very contradictory statements to law enforcement and his decision to obtain an illegal firearm and go out that night—armed—despite his escalating beef with Ingram and his anticipation that "something was going to happen."

the charge of manslaughter, there must be no evidence whatsoever tending to reduce the crime from murder to manslaughter." *Id.* at 596, 698 S.E.2d at 608.

> Voluntary manslaughter is a lesser offense of murder not by virtue of the elements test, but because it has traditionally been considered a lesser offense of murder. Therefore, a trial court must allow the jury to consider the lesser offense of voluntary manslaughter if there is evidence from which it could be inferred that a defendant committed voluntary manslaughter rather than the greater offense of murder.

*State v. Burdette*, 427 S.C. 490, 497, 832 S.E.2d 575, 579 (2019).

"[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Cook v. State*, 415 S.C. 551, 559, 784 S.E.2d 665, 669 (2015) (quoting *Hopper v. Evans*, 456 U.S. 605, 611 (1982)). However, "[i]f there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." *Starnes*, 388 S.C. at 596, 698 S.E.2d at 608. "To justify charging the lesser crime, the evidence presented must allow a rational inference the defendant was guilty only of the lesser offense." *State v. Sims*, 426 S.C. 115, 130, 825 S.E.2d 731, 738 (Ct. App. 2019) (quoting *State v. Geiger*, 370 S.C. 600, 607, 635 S.E.2d 669, 673 (Ct. App. 2006)).

"Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *Cook*, 415 S.C. at 556, 784 S.E.2d at 668 (quoting *State v. Walker*, 324 S.C. 257, 260, 478 S.E.2d 280, 281 (1996)). "[B]oth heat of passion and sufficient legal provocation must be present at the time of the killing." *Starnes*, 388 S.C. at 596, 698 S.E.2d at 608. "A defendant is not entitled to a voluntary manslaughter charge merely because he was in a heat of passion" or "merely because he was legally provoked." *Id.* at 596–97, 698 S.E.2d at 608. Rather, "there must be evidence that the heat of passion was caused by sufficient legal provocation." *Id.* at 597, 698 S.E.2d at 608.

"In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *State v. Smith*, 391 S.C. 408, 413, 706 S.E.2d 12, 15 (2011).

> The sudden heat of passion need not dethrone reason
> entirely or shut out knowledge and volition, but it must
> be such as would naturally disturb the sway of reason and
> render the mind of an ordinary person incapable of cool
> reflection and produce what may be called an
> uncontrollable impulse to do violence.

*State v. Sams*, 410 S.C. 303, 309, 764 S.E.2d 511, 514 (2014).

"[A] person's fear immediately following an attack or threatening act may cause the person to act in a sudden heat of passion." *Starnes*, 388 S.C. at 598, 698 S.E.2d at 609. "However, the mere fact that a person is afraid is not sufficient, by itself, to entitle a defendant to a voluntary manslaughter charge." *Id.* "[I]n order to constitute 'sudden heat of passion upon sufficient legal provocation,' the fear must be the result of sufficient legal provocation **and** cause the defendant to lose control and create an uncontrollable impulse to do violence." *Id.* "Evidence that fear caused a person to kill another person in a sudden heat of passion will mitigate a homicide from murder to manslaughter—it will not justify it." *Id.* at 599, 698 S.E.2d at 609.

We acknowledge the question of whether Petitioner acted in a sudden heat of passion is a close one. But instruction on a lesser offense is appropriate when "any evidence" supports the lesser charge. Both Petitioner and Ingram testified as to prior altercations between their respective neighborhoods, referencing separate incidents two and four days prior to the shooting. Regarding the night of the shooting, Petitioner and Gardner both testified they were surrounded in a threatening manner by several westside men after they arrived at Carnell's, and Petitioner feared he was about to be jumped when the group formed a semi-circle around him. Both Petitioner and Gardner were scared. Several witnesses testified people pointed Petitioner out to Ingram when Ingram and Tisdale arrived, and Ingram believed people were encouraging him to fight Petitioner.

Witnesses also testified that as Petitioner either walked or ran away from the group of westside men, Ingram and Tisdale followed closely behind him, with Gardner testifying Ingram and Tisdale "went after" Petitioner immediately after he started towards the Super Chic store. Jackson continued to watch after the men walked off because he thought he was about the see a fight. Petitioner testified that when he heard someone come up behind him and ask, "What's up now?" he turned and saw Ingram and Tisdale just three feet from him. Petitioner recalled he was scared

when he saw Ingram reach toward his waist because Ingram was known to carry a weapon, "So, I proceeded to pull my gun out and shot two, two to three times." Petitioner admitted that Tisdale and Ingram running after him caused him to be fearful and frightened; he was already scared and did not know what to do because the prior incidents indicated hostilities between the opposing groups were escalating.

Although Petitioner's testimony established the main provocation on the night of the shooting came from Ingram, Tisdale accompanied Ingram in following Petitioner and both were clearly part of the approaching, threatening westside group. *See State v. Locklair*, 341 S.C. 352, 362, 535 S.E.2d 420, 425 (2000) ("Provocation necessary to support a voluntary manslaughter charge must come from some act of or related to *the victim* in order to constitute sufficient legal provocation." (emphasis added)); *id.* ("The provocation *of the deceased* must be such as naturally and instantly produces in the mind of a person ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or *terror*, rendering the mind incapable of cool reflection." (second emphasis added) (quoting *State v. Franklin*, 310 S.C. 122, 125, 425 S.E.2d 758, 760 (Ct. App. 1993))). In light of the prior troubles between Petitioner and the westside group and the menacing actions of the various westside men on the night of the shooting, we find evidence exists to support the PCR court's finding that trial counsel was not deficient in failing to object to the voluntary manslaughter instruction as a lesser-included offense. *See*, *e.g.*, *Starnes*, 388 S.C. at 596, 698 S.E.2d at 608 ("If there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge.").

**Conclusion**

Accordingly, the PCR court's order denying relief and dismissing Petitioner's PCR application is

**AFFIRMED.**

**GEATHERS, J., and HILL, A.J., concur.**